**MUTH v. AETNA OIL CO.**

**No. 10279.**

United States Court of Appeals Seventh Circuit.

Argued April 17, 1951.

Decided May 8, 1951.

Albert Ward, Palmer K. Ward, Indianapolis, Ind., Milford M. Miller, William C. Welborn, Evansville, Ind., for appellant.

Joe S. Hatfield, Charles H. Sparrenberger, Joe Vol Butt and Bert C. Cheatham, Evansville, Ind., De Roo Weber, Mount Vernon, Ind., Curtis C. Plopper, Evansville, Ind., for appellee.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

MAJOR, Chief Judge.

This is an appeal from a judgment adverse to the plaintiff, entered August 7, 1950, in an action wherein plaintiff sought relief in a variety of forms by reason of an oil and gas lease in which he at the time of its execution acquired a one-half interest. The cause was referred to a Special Master who, after hearing, made findings of fact and conclusions of law, which in the main were approved by the trial court. Consistent with such report, the court entered the judgment from which plaintiff has appealed.

There is little, if any, dispute concerning the facts as found by the Master. Plaintiff's contention in the main is that the court applied erroneous legal principles to the facts as found. In the beginning, it appears appropriate to show the connection of the various parties with the subject matter of the litigation, together with some of the more salient acts and transactions upon which plaintiff asserts his right to relief. On October 6, 1947, the defendants Arthur Oeth and Robert Oeth, then operating a business under the unincorporated firm name of The Oeth Drilling Company, parties of the first part, entered into a partnership agreement with the plaintiff John J. Muth, party of the second part, wherein such parties mutually agreed to associate themselves together in securing oil and gas leases, royalties and drilling contracts. In such agreement it was provided, "All Leases or royalties taken for this partnership shall be written in the names of, Arthur Oeth and Robert Oeth, as owners of a One half interest and John J. Muth, Sr., as owner of a One half interest." The agreement provided, "Either party may cancel this agreement by giving a 30 days written notice to the other party," and "either party shall have the right to engage in the same or other lines of business, separate from this partnership, so long as it is not done at the expense of this partnership."

The parties acting pursuant to said agreement obtained a number of oil and gas leases, including the one around which the instant controversy revolves, obtained December 22, 1947 (sometimes referred to as the joint lease), from the defendants Fred J. Keck and Ida F. Keck, his wife, on 67.5 acres of land and in which Arthur Oeth and Muth were designated as lessees. The lease was acknowledged before a notary public and recorded in the appropriate recorder's office. It did not reveal the partnership relation existing between Muth and Oeth, although the court found, "At the time of the execution of said lease it was known to the lessors that the lessees were partners in the business of taking oil and gas leases." The lease was for the primary term of three years from date and as long thereafter as drilling operations were continued. It also provided, "This Lease shall terminate in three months and be null and void as to both parties unless the Lessees or their assigns shall commence or cause to be commenced the drilling of a test well and

thereafter continue with due diligence to completion."

On January 5, 1948, Arthur Oeth directed a letter to Muth which, after reciting the cancellation provision contained in the partnership agreement, stated, "As per said agreement, you are hereby notified that I, as one of the partners, do give you notice that said agreement is hereby cancelled." Receipt of this letter was acknowledged by Muth in a letter to Oeth dated January 12, 1948, in which he stated, "The cancellation is agreeable with me." On March 1, 1948, Muth wrote Arthur Oeth a letter in which he stated, "The time for the commencing of a well on the Keck lease is getting short and I would like it if you and Robert would meet with me the earliest possible date and see if we can work out a peaceful and satisfactory dissolution agreement of our jointly owned business." Arthur Oeth made no answer to this letter, but a few days thereafter and without the knowledge of Muth obained from Keck, who was his uncle, a lease (called the "top lease") for gas and oil on the same land covered by the joint lease. This "top lease" was dated December 22, 1947, the same as the joint lease, and was substantially a copy thereof, with the exception that the time (for drilling a test well) was extended thirty or sixty days. (This lease was subsequently destroyed by Oeth. The circumstances under which it was executed and its purpose will be later discussed.)

The joint lease, by reason of the provision heretofore quoted, became void at midnight on March 22, 1948, unless the drilling of a test well was commenced by that time. On March 19, 1948, Muth entered into a contract with the defendant Boland, by which the latter agreed to commence the drilling of a well on or before March 22, 1948, and made arrangements with one Baldwin to assist him in such drilling. On the 20th or 21st of March, Boland made a survey, and on March 22, hauled some equipment to the Keck farm. The purpose of making Boland a defendant is not clear, but we suspect it was to preserve diversity jurisdiction. It certainly appears that his in-terests were not hostile to those of Muth. Boland failed to answer and a default was taken as to him. In the state of the record, we are unable to discern whether Boland was a citizen of Illinois, as alleged, or of Indiana. However, no jurisdictional issue is pressed here and we give the question no further consideration.

Keck, on March 23, elected to treat the joint lease as forfeited. The defendant Husk, prior to the time of the asserted forfeiture, had expressed a desire to obtain a lease on the Keck land and had conversed with Keck concerning the same, the last conversation occurring on March 22. On March 23, Muth and Boland went to the Keck farm, and later Arthur and Robert Oeth and Husk also arrived. Shortly afterward, the Oeths, Keck and Husk left in the latter's automobile and proceeded to the city of Evansville, Indiana, and to the offices of attorney Vol Butt. Said attorney prepared for Keck a written notice, dated March 23, 1948, and directed to Boland and Muth, which, after reciting the provision in the joint lease relative to the time when the drilling of a test well was to be commenced, stated, "No well was commenced on or before three months from the date of the lease and no drilling has been commenced even now. You are advised that you are trespassing without right upon my property. I hereby demand that you leave my property and notify you that I shall hold you responsible in damages for all of your acts in trespassing or in continuing to trespass on my land."

This notice was signed by Keck, and in the afternoon of the same day was served upon Boland and Muth. Prior thereto, Arthur Oeth and Husk had advised Keck that they would defend any law suit that might be instituted against him by reason of any prior oil and gas leases on said premises, and with particular reference to the joint lease. Following the service of the notice, Muth and Boland left the premises. On March 27, 1948, Husk obtained an oil and gas lease on the Keck premises for and on behalf of the defendant Johnston Drilling Company, Inc. At the same time, attorney Vol Butt prepared

an instrument addressed to the Kecks, signed by Johnston Drilling Company, Inc., Husk and Arthur Oeth, in which it was stated, "However, in the event any claim is made against you by any former lessee, we agree to defend such action and to protect you against whatever claims are asserted by former lessees." On June 2, 1948, defendant Aetna Oil Company took an assignment of a one-half interest in and to said lease of the Johnston Drilling Company, Inc., subject to an overriding royalty of one-sixteenth of seven-eighths interest to an unnamed party, later disclosed to be Husk.

Subsequently, Johnston Drilling Company, Inc. and Aetna Oil Company, under an operating agreement, drilled three producing wells upon the Keck land, the net proceeds of which have been impounded, with the exception of certain royalties paid to Husk. Thus, it will be observed from the facts as related that of the parties to the suit only the plaintiff Muth and the defendants Arthur Oeth and Robert Oeth had any dealings or made any agreements with the defendant Keck until subsequent to midnight March 22, 1948. In fact, the lease of March 27, 1948, obtained by Husk, on behalf of Johnston Drilling Company, Inc., represents the first dealing between those defendants and Keck. This statement perhaps is subject to the limitation that Husk had talked with Keck concerning a lease prior to midnight of March 22, 1948. Aetna Oil Company did not come into the picture until later, when it was assigned an interest in the March 27 lease acquired by Johnston Drilling Company, Inc.

It appears to be the theory of the plaintiff that a conspiracy was entered into among all the defendants (except Boland) the purpose of which was to prevent Muth from performing under the three-month clause so that Keck might declare a forfeiture and thereby void such lease. And the result of the conspiracy is shown, so it is asserted, by Keck's lease to Johnston Drilling Company, Inc., under date of March 27, 1948. If this conspiracy theory has any substance, it must be that it was conceived by Arthur Oeth and Keck, and

that the other defendants, with knowledge thereof, later joined and became responsible for its results.

While it is not directly asserted, it is strongly implied that attorney Vol Butt had knowledge of the wrongful acts of Arthur Oeth and Keck and that such knowledge was attributable to the defendants, most of whom he represented at some time, either in court or as a consultant. It is recited in considerable detail that he represented both Johnston Drilling Company, Inc. and Aetna Oil Company in examining title to the leasehold acquired by the former on March 27, 1948; that he prepared on behalf of Keck the forfeiture notice served on Muth and Boland; that he prepared on behalf of Johnston Drilling Company, Inc. the instrument by which it was agreed to indemnify Keck and his wife on account of any claims growing out of former leases, and that he represented Keck and Husk in a state court proceeding growing out of the same subject matter as the instant case. We are not able to discern anything wrong with the activities of the attorney. His first connection with the matter was when he was consulted by Keck, accompanied by Oeth and Husk, as to whether the joint lease in which Muth had a one-half interest was subject to forfeiture because of failure to comply with the three-month provision. He evidently advised Keck that it was, and prepared a notice to be served on Muth and Boland. There is nothing to indicate but that his opinion was sound and given in good faith, but even though he had erred as to the legal situation, it would be no evidence of wrongdoing. And certainly there is nothing inconsistent with his position on that occasion and the fact that he examined and passed upon the title for Keck's subsequent grantee, which stemmed from the March 27 lease, nor was there anything inconsistent with his appearance in court in behalf of those who had relied upon his opinion.

Plaintiff's case must rest on the premise that he was never legally divested of his interest in the Keck land, and this premise must be supported by one of two theories,

(1) that plaintiff performed prior to midnight March 22, 1948, under the three-month provision of the joint lease, or (2) that by reason of the so-called "top lease" given by Keck to Arthur Oeth early in March 1948, the time for performance under the joint lease was extended to the same extent as that provided in the "top lease."

As already shown, plaintiff on March 19, 1948 entered into a contract with the defendant Boland whereby the latter agreed to move a cable drilling rig onto the Keck farm and commence the drilling of a well on or before March 22, 1948. Thereupon, Boland got in contact with one Baldwin, who agreed by telephone to assist in such drilling. Boland moved a drilling rig upon the Keck farm late in the afternoon of March 22, 1948. Admittedly, this drilling rig was incapable of drilling a well such as was required by the lease. However, it was suggested by Baldwin that Boland move on the rig he had and that he (Baldwin) would later furnish another rig. More than that, without going into too much detail, it plainly appears that the rig which was moved in on the Keck farm was not equipped to drill any kind of a hole. There was lacking a rope socket, stem and a bit, a bailer, a drill stem, a drill bit, sufficient drilling cable and the necessary tools. The rig, on the evening of March 22, was left in the Keck barn lot, about 700 feet from the location where the well was to be drilled. There it remained until the following morning, when Muth and Boland showed up and were served with the forfeiture notice. The court found, "That neither the plaintiff nor the defendants Oeth obtained either a drilling permit or drilling bond from the State of Indiana for the drilling of any well on the Keck premises."

Plaintiff cites cases and authorities in support of his contention that the moving into Keck's lot of the drilling rig under the circumstances stated constituted a compliance with the three-month clause of the joint lease. Summers Oil and Gas, Permanent Edition, Vol. 2, Section 348; Cromwell v. Lewis, 98 Okl. 53, 223 P. 671; Fast v. Whitney, 26 Wyo. 433, 187 P. 192. It is true that these authorities hold under situations somewhat similar that it is not necessary that a drilling of a hole actually be commenced in order to show compliance but that it is sufficient if the lessee was on the premises in good faith, ready, able and willing to perform. The rule stated in Summers (Sec. 349) is as favorable to the plaintiff as we have read. It states, "The general rule seems to be that actual drilling is unnecessary, but that the location of wells, hauling lumber on the premises, erection of derricks * * * when performed with the bona fide intention to proceed thereafter with diligence toward the completion of the well, constitute a commencement or beginning of a well or drilling operations within the meaning of this clause of the lease." Both the textbook and the cases cited emphasize the importance of good faith and a bona fide intention on the part of the lessee to drill.

On the other hand, there are cases which hold, under a clause which requires the commencement of drilling as in the instant case, that compliance requires the actual commencement of the drilling of the hole. In Lewis v. Nance, 20 Cal.App.2d 71, 66 P.2d 708, the court considered a three-month clause in almost the identical language of the instant case. In discussing whether there was compliance by the lessee, the court stated 66 P.2d at page 709, "We think the language of this particular lease must be interpreted as requiring the starting of actual drilling within the time named. * * * [Citing cases.] The distinction between leases with respect to whether actual drilling or the beginning of operations preparatory to drilling is required has been recognized in two cases in this state. [Citing cases.]" To the same effect see Johnston v. Courtil, 216 Cal. 506, 14 P.2d 771.

■ The court found, "That the plaintiff Muth and the defendant Boland did not commence the actual drilling of an oil well on the Keck property by midnight of March 22, 1948. That they were not equipped to commence drilling a well of any kind on the Keck property by midnight of March 22, 1948." And the court

concluded, "That the oil and gas lease of December 22, 1947, given to the plaintiff Muth and the defendants, Oeth, expired under its own terms by failure of either the plaintiff Muth or the defendants Oeth to commence drilling a well on said property prior to midnight of March 22, 1948."

The finding thus made is, in our view, inescapable, and the conclusion necessarily follows. A reading of the record is convincing that neither Muth nor Arthur Oeth had the financial ability on their own to drill an oil well. They were both speculators, with neither the means nor expectation of drilling a well on their own, and there is no reason to think that Muth on the last evening of the last day procured a dilapidated drilling rig for the bona fide purpose of drilling under the Keck lease. It was merely a gesture, designed to extend the duration of his lease so that he might further speculate, rather than a bona fide effort to commence the drilling of a well as required by the lease.

Thus, Muth's interest in the lease (as well as Oeth's) terminated upon its forfeiture unless the time for compliance was extended by the alleged wrongful conduct on the part of Keck in granting to Arthur Oeth the so-called "top lease" early in March, 1948. On this phase of the case, plaintiff argues and cites cases in support of the rule that Oeth owed to his partner and co-tenant Muth in the oil and gas lease of December 22, 1947, the duty of exercising good faith in dealing with the partnership property, and that this duty was not terminated by giving the thirty-day notice to cancel the partnership agreement. For the reasons already stated, we think the partnership agreement was dissolved by Oeth's notice to Muth of such dissolution and the acceptance of the same by the latter. Moreover, the parties recognized the partnership as dissolved because no further leases were taken in its name. The leases which they then held, and particularly the Keck lease, were held as co-tenants rather than as partners. They each had a right to sell their respective interests, and the record discloses that they each attempted to do so. Even

so, we assume, as plaintiff contends, that they each owed the other good faith in dealing with the jointly owned property. However, it seems that good faith would require nothing more than that each refrain from impairing or placing in jeopardy the right or interest of the other.

The court in its finding has aptly described the circumstances relative to the "top lease." The court found:

"That the divers persons whom plaintiff Muth and defendant Oeth had separately attempted to interest in the development of said Keck lands had stated the necessity of additional leasehold acreage adjoining the Keck lands prior to attempting such drilling, and in the latter part of February or early in March, 1948, the defendant, Arthur Oeth, again attempted to obtain an oil and gas lease on the Mesker lands adjoining the Keck lands and to that end requested the defendant, Fred J. Keck, to sign in favor of the defendant, Arthur Oeth, a lease form generally similar to the lease of December 22, 1947 (which original lease of December 22, 1947, was in the possession of the plaintiff Muth), to exhibit to Mrs. Mesker, which lease is referred to in the testimony as the 'top lease'; that the lease was an exact copy of the lease of December 22, 1947, with the exception that the time was extended thirty or sixty days; that it was then and there agreed between the defendants, Arthur Oeth and Fred J. Keck (1) that said lease was to be of no effect unless a lease was then obtained on the Mesker lands and the sum of $1.00 per acre paid to the defendant, Fred J. Keck, (2) that if such Mesker lease were obtained and the agreed consideration paid, the plaintiff Muth was to participate in said 'top lease' if he returned and desired to participate; that said 'top lease' was not notarized nor was it ever recorded; that the sole purpose of the defendant, Arthur Oeth, in obtaining said 'top lease' was in an attempt to obtain the Mesker and other adjoining leases in order to gain acreage to induce development on the Keck lands by March 22, 1948, and thereby preserve his leasehold rights and those of the plaintiff, Muth.

"That defendant, Arthur Oeth, did exhibit said 'top lease' to Mrs. Mesker, but was unable to obtain from her an oil and gas lease satisfactory to him; that defendant, Arthur Oeth, did not pay or tender said sum of $1.00 per acre to defendant, Fred J. Keck, and that neither of said defendants, Oeth or Keck, treated said 'top lease' as a subsisting lease nor asserted that the same in any way replaced or superseded the original oil and gas lease of December 22, 1947; that such exhibit lease was destroyed by defendant, Arthur Oeth.

"That on or about March 10, 1948, defendant, Fred J. Keck, informed plaintiff Muth of this attempt made by defendant, Arthur Oeth, to obtain an oil and gas lease on the Mesker lands and advised plaintiff Muth of the exhibit lease or 'top lease' used in such attempt; but defendant, Fred J. Keck, did not assert any invalidity of the original oil and gas lease of December 22, 1947, but admitted the plaintiff Muth's rights thereunder, provided timely performance was effected."

In view of these findings, no logical basis is discernible in support of plaintiff's theory that there was any purpose on the part of Arthur Oeth or Keck, and particularly the latter, that the "top lease" was for the purpose of doing any wrong or injury to Muth; in fact, it would seem that the lease was not worth more than the paper upon which it was written. Certainly it was not binding upon Keck and that it was not so intended is evidenced by the fact that it was destroyed by Oeth. More than that, the fact that Keck informed Muth that the lease had been given to Oeth, the purpose for which it had been given, and that it had no effect upon the latter's interest in the joint lease, indicates good and not bad faith on the part of Keck. And this information was given to Muth some twelve days before the expiration of the time for performance under the latter lease.

■ Neither is there any merit in the point, as showing Keck's involvement in a conspiracy, that he required an indemnifying agreement before he would execute the lease of March 27, 1948 to Johnston Drilling Company, Inc. Keck, at the time of serving the forfeiture notice on Muth and Boland, had been told by the latter that such action would mean a law suit, and it was perfectly natural that Keck under the circumstances desired to be protected. More than that, if the lease in controversy terminated at midnight on March 22, as we hold, Keck was free to do with his land as he saw fit and when he gave another lease to impose such conditions as he desired. In this connection, it is pertinent to note that the royalty to be received by Keck as the lessor was the same in the two leases, that is, the joint lease in which Muth was a co-tenant and the lease given to the Johnston Drilling Company, Inc. The only advantage which accrued to him was that in the latter lease he was dealing with a party capable of drilling, as is evidenced by the fact that three wells were drilled shortly. And it may also be observed that the interest of Arthur Oeth, as well as that of Muth, terminated at the time of the forfeiture of the joint lease and that Oeth acquired no interest, directly or otherwise, in the lease of March 27, 1948, or in royalties derived therefrom.

■ The court found, "That defendants Keck did nothing nor said anything to hinder plaintiff or defeat performance by him under the lease of December 22, 1947; that the sole aim of defendants Keck in executing the lease of December. 22, 1947, and the lease of March 27, 1948, was to gain development and that the royalties provided in and the prospective benefits from said leases were exactly the same; that defendants Oeth neither hindered nor helped plaintiff toward drilling under the lease of December 22, 1947; that defendants Keck, Husk, Johnston Drilling Company' and Aetna Oil Company, did nothing to prevent performance by plaintiff under the lease of December 22, 1947 * * *." We think this finding is amply supported and must be accepted, and this is so notwithstanding there is some evidence, much relied upon by plaintiff, that Arthur Oeth told two or three parties that he had a "top lease" on the Keck land.

From the testimony of such witnesses, however, it appears that they were interested only in purchasing an interest in the lease but not in drilling. But even though we assume that Oeth sought to utilize the "top lease" for a purpose other than that for which it was granted (heretofore shown), it is not discernible how statements made by him out of the presence of the other defendants would be binding upon them. In any event, the weight and credit to be given such testimony was for the trial court.

The premise upon which plaintiff's case is founded imperatively requires that Keck be included as a party to the conspiracy alleged. He is the connecting link between those with whom he dealt under the joint lease of December 22, 1947, and those with whom he dealt and who claim under the lease of March 27, 1948. There is no basis on this record for the conclusion that he either individually or in concert with others intentionally committed a wrong against plaintiff or anybody else. On the other hand, we think he acted honestly and in good faith. Instead of being the beneficiary of a conspiracy, as alleged, he is fortunate not to be a victim. With his absolution as a conspirator, plaintiff's case falls like a house of cards.

The judgment appealed from is

Affirmed.