GEIER–JACKSON, Inc., a corporation,
Plaintiff,

v.

W. B. JAMES, V. M. Johnston, E. M.
James and Cecil W. James,
Defendants.

Civ. A. No. 2375.

United States District Court,
E. D. Texas,
Tyler Division.

Feb. 14, 1958.

Conan Cantwell, J. Howard Lennon, Dallas, Tex., for plaintiff.

F. Wilbert Lasater, of Spruiell, Lowry, Potter, Lasater & Guinn, Tyler, Tex., for defendants.

SHEEHY, Chief Judge.

Plaintiff is a corporation organized and existing under and by virtue of the laws of the State of Minnesota. The defendants, and each of them, are residents and citizens of the State of Texas. The matter in controversy exceeds in value the sum of $3,000.

The plaintiff, alleging to be the owner of a certain oil, gas and other minerals lease, hereinafter referred to as oil and gas lease, and alleging that the defendants are asserting that they are the owners of the land covered by said lease free of said lease, instituted this suit seeking to have its title to said oil and gas lease quieted against the claims of the defendants, and each of them. The defendants by their answer allege that said oil and gas lease had expired prior to the institution of this suit and that they are the owners of said land and that they are the owners of all of the oil, gas and other minerals in and under the land covered by said oil and gas lease free from said oil and gas lease, the defendant, V. M. Johnston, owning an undivided one-half interest, the defendant, W. B. James owning an undivided one-sixth interest and the defendants, E. M. James and Cecil W. James, owning the remaining two-sixths interest. By way of cross claim against the plaintiff, the defendants asked for judgment declaring the oil and gas lease described in plaintiff's complaint to be expired and terminated and for judgment removing the cloud cast upon their title to all the oil, gas and other minerals in and under the lands described in said lease asserted by plaintiff under said oil and gas lease.

The oil and gas lease described in plaintiff's complaint and the one here in question is dated July 9, 1947, and was executed by W. B. James and V. M. Johnston, as lessors, in favor of A. D. Adams, as lessee, covering 111 acres, more or less, in the Ransom Rucker Survey, Anderson County, Texas, which oil and gas lease is recorded in Volume 385, page 99 of the Deed Records of Anderson County, Texas. The lease was for a primary term of ten years from the date thereof and as long thereafter as oil, gas or other minerals were produced from said land. The lease also provided that if drilling was not commenced on the land covered thereby before one year from the date of the lease, the lease would terminate unless on or before such anniversary date lessee paid the delay rentals therein provided for and that the payment of such delay rentals on or before such date would extend to lessee the privilege of deferring the commencement of drilling operations for a period of one year and in like manner and upon like payments or tenders annually the commencement of drilling operations could be further deferred for successive one year periods each during the primary term. The lease further contained the following provisions which will hereinafter be referred to as the "60 day clause":

"If at the expiration of the primary term, oil, gas or other mineral is not being produced on said land, or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary term, the lease shall remain in force so long as

operations are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land or acreage pooled therewith."

The defendants, E. M. James and Cecil W. James, acquired the interest they now own in the oil, gas and other minerals in and under the land described in the lease here in question by assignment from W. B. James dated July 11, 1957.

Subsequent to A. D. Adams acquiring the lease in question, as aforesaid, he assigned said lease to the Jackson Production Company, a corporation, in which he owned approximately 40% of the stock and in which the remaining approximately 60% of the stock was owned by F. B. Jackson, Jr. and wife, Betty M. Jackson. In either 1952 or 1953 the Jackson Production Company was dissolved, following which dissolution A. D. Adams owned an undivided approximately 40% interest in the lease in question and the remaining interest in said lease was owned by F. B. Jackson, Jr. and his former wife, Betty M. Jackson.

In July 1947 F. B. Jackson, Jr., who will be hereinafter referred to as Jackson, and A. D. Adams acquired an oil, gas and other minerals lease from one H. M. McMahan covering 258.59 acres. For convenience this lease will be hereinafter referred to as the McMahan Lease, and the land covered by said lease will hereinafter be referred to as the McMahan Tract. Also for convenience the land covered by the lease here in question will hereinafter be referred to as the James-Johnston Tract. The McMahan Tract was located north of and adjacent to the James-Johnston Tract. The primary term of the McMahan Lease was to expire on July 11, 1957.

At all times pertinent hereto Jackson was the President and General Manager of the Plaintiff Corporation and maintained his office in Dallas, Texas. On July 10, 1957, there was sent from Jackson's office to A. D. Adams by letter of transmittal signed by Jackson's secretary an assignment in the nature of a farmout agreement, under the terms of which A. D. Adams assigned his undivided interest in the McMahan Lease and in the lease in question to Jackson with the request that A. D. Adams execute said lease and return same to Jackson's office. The assignment reserved unto Adams a one-eighth overriding royalty interest in the oil, gas and other minerals in and under the lands covered by the lease assigned. A. D. Adams executed said assignment on July 12, 1957, and on the same date returned it to Jackson's office. The assignment was never recorded but it was produced from the files of Jackson at the trial and introduced in evidence by the defendants. There was also introduced in evidence an assignment executed by Jackson, Betty M. Jackson and A. D. Adams, under the terms of which Jackson, Betty M. Jackson and Adams assigned all of their right, title and interest in and to the lease in question to the Plaintiff Corporation. This assignment made no provision for an overriding royalty interest in favor of either Adams or the other assignors. The assignment provides that it should be effective as of July 1, 1957, and the acknowledgement of each assignor is dated July 1, 1957. However, Jackson admitted that Adams did not execute such assignment until about August 22, 1957. The assignment was recorded in the Deed Records of Anderson County, Texas, but was not filed for record until August 22, 1957.

Jackson testified, in effect that sometime prior to July 8, 1957, it was agreed between A. D. Adams, Betty M. Jackson and himself that they were to assign the lease in question to the Plaintiff Corporation and thereafter the plaintiff was to be the owner of the lease. For the purpose of this case it is assumed that the plaintiff acquired the lease in question on July 1, 1957. The plaintiff never at any time owned an interest in the McMahan Lease.

There has never been any production of either oil or gas on the James-John-

ston Tract. There were no drilling operations of any kind on the James-Johnston Tract during the primary term of the lease in question prior to July 8, 1957. In July 1957 both the James-Johnston and the McMahan Tracts were in what is commonly called a wildcat area, i. e., there had been no discovery of either oil or gas in such close proximity to such tracts as would prove or tend to prove that said tracts would in reasonable probability be productive of either oil or gas.

Jackson testified that sometime prior to July 8, 1957, he decided to drill a well exploring for oil and/or gas on the McMahan Lease, which well was to be drilled by him personally with the plaintiff having no interest therein, and that at the same time he decided on behalf of the plaintiff that the plaintiff would commence the drilling of a well exploring for oil and/or gas on the James-Johnston Tract. On July 8, 1957, plaintiff's drilling superintendent, acting upon the instructions of Jackson, had a surveyor stake the locations for the contemplated wells on the McMahan Tract and the James-Johnston Tract. On the same date the drilling superintendent caused a road to be built from the location on the McMahan Tract to a point on a creek on the James-Johnston Tract about 75 feet from the location on the James-Johnston Tract, which road was built by using a bulldozer to knock down the trees and to scrape off or grade the ground. This road went past the James-Johnston location to the creek and a pump was moved over the road to the creek and there set. Water pipe was run from the pump to the McMahan location and water for the drilling of the McMahan well was obtained through the use of this pump and the water pipe. On July 8th the drilling superintendent also caused a small drilling rig of the size commonly used for drilling water wells to be moved on the James-Johnston location and drill a hole approximately 20 feet deep at said location. The drilling rig was then moved to the McMahan Lease and it was used to drill a shallow hole at the McMahan loca-

tion. A bulldozer was used to clear a small area at the location on the James-Johnston Tract in order to get the small drilling rig in and out, and a shallow pit, about eight feet by eight feet, was scraped out by the bulldozer in order that conductor pipe might be set. Approximately 200 feet of surface pipe was set on the McMahan Lease but no surface pipe was set on the James-Johnston Tract. However, conductor pipe, which serves a different purpose than does surface pipe, was set in the 20 foot hole on the James-Johnston Tract. The clearing made at the location site on the James-Johnston Tract was not as large as it would have to be for the drilling of an oil well. The road built on the James-Johnston Tract was not wide enough for the moving in of a regular oil well drilling rig. On July 9, 1957, some more scraping or grading was done on the James-Johnston Tract, and on or about August 14, 1957, a small amount of scraping or grading was done on the road on said tract.

At all times pertinent hereto plaintiff owned at least two oil well drilling rigs capable of drilling wells to a depth of at least 12,000 feet. One of these rigs was referred to as No. 5 rig and the other was referred to as No. 2 rig. On July 8, 1957, the No. 2 rig was sitting idle on another lease about five or six miles from the James-Johnston Tract where it had been sitting idle for about a year and where it remained sitting idle until on about September 8, 1957. Sometime subsequent to July 8, 1957, the No. 5 rig was moved to the location on the McMahan Tract and was there used to drill a well to approximately 5,800 feet, which well was completed as a producer of oil on about August 15, 1957. The rig was then torn down about August 25, 1957, and moved to a location about five or six miles from the McMahan Lease where it sat idle for two or three months.

Jackson did not complete the McMahan well. When the drillstem test showed oil, Jackson decided not to undertake the completion and incur the additional expense incident thereto but assigned to

one Hughey the north 40 acres of the Mc-Mahan Tract on which the McMahan well was located, and Hughey completed the McMahan well as a producer. A. D. Adams and Betty M. Jackson joined Jackson in said assignment to Hughey, and there was reserved unto Jackson, A. D. Adams and Betty M. Jackson an overriding royalty interest equal to one-eighth of eight-eighths of the oil, gas and other minerals produced and saved from said 40 acre tract after Hughey received from the production on the 40 acre tract the sum of $15,000.

Jackson had difficulty with the first pump that was placed on the James-Johnston Tract and that pump had to be replaced about August 14th. In order to move the new pump in and the original pump out a truck or trucks had to be driven over the road on the James-Johnston Tract. Just before the substitution of the pump was made on August 14 it had rained and as a result of the rain the road on the James-Johnston Tract had been washed to some extent. In order to get the road in shape to be used by the truck or trucks in making the pump exchange additional scraping or grading had to be done on the road and that was the scraping or grading that was done on August 14, 1957, as aforesaid. When the McMahan well was completed, the pump and water pipe located on the James-Johnston Tract were removed from the James-Johnston Tract. Neither the plaintiff nor Jackson performed any work on the James-Johnston Tract other than that above mentioned until September 8, 1957.

On July 8, 1957, and for a period of time thereafter up to at least September 9, 1957, both the plaintiff and Jackson were undergoing financial difficulties. Each of them owed taxes on properties owned by them in Anderson and Houston Counties, Texas, that were delinquent. There were outstanding money judgments against each of them, and during that period of time they were unable to pay their employees the full wages due them. Jackson admitted that the plaintiff did not desire to undertake by itself the drilling of the well on the James-Johnston Tract but that it desired financial help and assistance in the drilling of said well. He further testified that he made arrangements for such financial help and assistance but that such arrangements were not made until the latter part of August, 1957.

On August 5, 1957, W. B. James, by identical letters addressed to Jackson Production Company and F. B. Jackson, Jr., stated, in effect, that they had not fulfilled their obligations under the lease in question and that he was declaring the lease terminated and that they should refrain from going upon the land covered by said lease for any purpose. Neither of these letters was signed by V. M. Johnston, however, James showed the letters to Johnston before he mailed them and Johnston knew the contents thereof.

On Sunday, September 8, 1957, James contacted plaintiff's drilling superintendent by telephone and instructed him to start moving that day plaintiff's No. 2 drilling rig to the location on the James-Johnston Tract. Pursuant to those instructions the drilling superintendent started moving said drilling rig onto the James-Johnston Tract, with the first part thereof having been moved on said tract on September 8th. He continued to move the drilling rig onto said tract until he had moved about three-fourths of it on the tract when he was instructed by Jackson to discontinue the moving of the drilling rig onto the tract. On September 9, 1957, V. M. Johnston and W. B. James, jointly, sent Jackson a telegram in which they advised, in effect, that unless Jackson released the James-Johnston Tract from the oil and gas lease in question suit would be filed for actual and exemplary damages and cancellation of the lease. On the same date Johnston and James wrote the plaintiff a letter in which they notified the plaintiff not to proceed further with drilling operations on the James-Johnston Tract as the lease in question had been terminated on July 9, 1957, and further notified the plaintiff that should it undertake to drill on said land suit would be filed to cancel the lease

and for damages. It was because of the telegram and the last mentioned letter that Jackson stopped the further moving of the No. 2 drilling rig onto the James-Johnston Tract, as aforesaid. On September 11th the defendants herein filed suit against the plaintiff herein in the District Court of Anderson County, Texas, for title to and possession of the James-Johnston Tract, for damages, both actual and exemplary, and prayed for an injunction enjoining the plaintiff herein from moving a drilling rig on and drilling a well for oil and/or gas upon the James-Johnston Tract. That suit was removed by the plaintiff herein to this Court and was docketed as Civil Action No. 2416 on the docket of this Court. When the trial of the instant case began, said Cause No. 2416 was dismissed without prejudice upon the motion of the defendants herein, the plaintiffs therein. Among other allegations contained in the complaint filed in said case in the District Court of Anderson County, Texas, the defendants herein, the plaintiffs therein alleged that the plaintiff herein was about to move a drilling rig on the James-Johnston Tract and drill a well for oil, gas and other minerals without any legal right to do so. The portion of the drilling rig moved onto the James-Johnston Tract remained on said tract until either the latter part of October or the first part of November 1957 when it was moved from said tract by plaintiff.

All of the delay rentals provided for in the lease in question were timely paid. Since no oil, gas or other minerals were being produced from the James-Johnston Tract or any acreage pooled with said tract on July 9, 1957, and a dry hole had never been completed on said tract, the lease in question expired by its own terms at midnight on July 9, 1957, unless such lease was extended past said date by virtue of the provisions of the 60 day clause contained in said lease and above quoted. For the 60 day clause to extend

said lease beyond July 9, 1957, under the facts in this case, plaintiff must have been engaged in drilling operations on July 9, 1957. If the plaintiff were engaged in such drilling operations at such time, the lease would remain in force as long as such drilling operations continued without cessation of such drilling operations for more than 60 consecutive days.[1] On the other hand if it were not engaged in such drilling operations at such time, the lease expired or terminated at midnight on July 9, 1957, and had no further force or effect thereafter.

The plaintiff contends that it was engaged in drilling operations within the meaning of the 60 day clause on July 9, 1957, and the defendants contend to the contrary. If the defendants are correct in their contention, there will be no need for a determination of any questions arising as to the effect of Mr. James' letter of August 5, 1957, above referred to, or the effect of plaintiff's action in moving a portion of its drilling rig No. 2 on the James-Johnston Tract on September 8th and 9th or the effect of the telegram and letter James and Johnston sent plaintiff on September 9th, as aforesaid.

The drilling operations referred to in the 60 day clause obviously mean operations incident to and connected with the drilling of a well for oil or gas. There could be no such operations unless there had been a commencement of a well for oil or gas. Although actual drilling is not necessary in order to constitute the commencement of a well, there can be no commencement of a well within the meaning of an oil and gas lease unless work incident to the drilling of an oil and gas well is being performed with the good faith intention to pursue with diligence the drilling of a well to such depth as an ordinarily prudent operator would drill under the same or similar circumstances in search for oil or gas in paying quantities.[2] The 60 day clause

1. Stanolind Oil & Gas Co. v. Newman Brothers Drilling Company, Tex., 305 S. W.2d 169, 173.

2. Street v. Masterson, Tex.Civ.App., 277 S.W. 407; Moore v. West, Tex.Civ.App., 239 S.W. 710 (Writ of Error Dismissed);

530

in the lease in question sets up the standard of diligence to be used but there is nothing in said clause that relieved the plaintiff from the duty of commencing a well on the James-Johnston Tract prior to midnight on July 9, 1957, with the good faith intention to pursue with the standard of diligence set forth in the 60 day clause the drilling of such well to such depth as an ordinarily prudent operator would drill under the same or similar circumstances in search for oil or gas in paying quantities if the plaintiff is to extend the lease in question past the expiration of the primary term thereof by virtue of the 60 day clause.[3] Plaintiff's intent to drill must have been unqualified. An intent to drill on the happening of certain contingencies such as favorable information gained from the drilling of the McMahan well or the making of favorable financial arrangements for drilling by the plaintiff of the James-Johnston well would not be sufficient. Did the plaintiff at the time it performed the work on the James-Johnston Tract it performed on July 8 and 9, 1957, as above found, have the good faith intention to pursue with the standard of diligence set forth in the 60 day clause, the drilling of such well to such depth as an ordinarily prudent operator would have drilled under the same or similar circumstances in search for oil or gas in paying quantities? In considering this question it will be assumed, provided the required intention to drill existed, that the work performed by plaintiff on the James-Johnston lease on July 8 and 9, 1957, as above found, was sufficient to constitute the commencement of a well for oil or gas. Plaintiff, with reference to the James-Johnston Lease, having acted solely through its president, Jackson, its intent must be judged by Jackson's intent. Intent is something that exists in a man's mind, and the trier of the facts cannot enter into the mind of a man to determine the intent with which he acted at a given time. Therefore, Jackson's intent has to be judged at least by his intelligence as shown by the evidence, by his experience in life, including his long experience in the oil and gas business, as shown by the evidence, and generally by judging him as reasonably prudent persons experienced in the affairs of everyday life judge each other. In judging his intent, his actions with reference to the McMahan well as well as his actions with reference to the James-Johnston Lease occurring subsequent to July 9, 1957, as shown by the evidence, may be looked to as well as his actions prior to and on July 8 and 9, 1957. Considering all these facts and circumstances, as shown by the evidence, I find and conclude that the question above posed must be answered in the negative, i. e., I find and conclude that the plaintiff, acting through its president, Jackson, at the time it performed the work it performed on the James-Johnston Tract on July 8 and 9, 1957, as above found, did not have the good faith intention to pursue with the standard of diligence set forth in the 60 day clause of the lease in question the drilling of a well on the James-Johnston Tract to such depth as an ordinarily prudent operator would drill under the same or similar circumstances in search of oil or gas in paying quantities and thus the plaintiff on July 9, 1957, was not engaged in drilling operations within the meaning of said 60 day clause. In light of this finding and conclusion it follows that the lease in question expired and terminated at midnight on July 9, 1957, and was of no force and effect thereafter.

As to plaintiff's action herein, judgment will be entered denying plaintiff all relief sought. As to the counterclaim of the defendants, judgment will be entered declaring that the lease in question expired and terminated at midnight on July 9, 1957, and removing the cloud cast

Woods v. Bost, Tex.Civ.App., 26 S.W.2d 299, 300 (Writ of Error Dismissed); 31A Tex.Jur. Sec. 154, p. 267; and Summers Oil and Gas, Vol. 2, Sec. 349, p. 256.

3. Stanolind Oil & Gas Co. v. Newman Brothers Drilling Co., supra.

upon defendant's title to all the oil, gas and other minerals in and under the James-Johnston Tract asserted by plaintiff under the lease in question. All Court costs will be adjudged against the plaintiff.

This Memorandum Decision will constitute the Findings of Fact and Conclusions of Law herein as authorized by Rule 52, Fed.Rules Civ.Proc. 28 U.S.C.A.