TRUE OIL COMPANY, a co-partnership, Sinclair Oil & Gas Company, a corporation, and Shell Oil Company, a corporation, Appellants (Plaintiffs below),

v.

W. R. GIBSON, Jr., Rex H. Baker, Thomas G. Dorough, H. P. Macauley, W. James Saul, Floyd E. Cook, and Myrtle Cook, Appellees (Defendants below).

No. 3210.

Supreme Court of Wyoming.

June 9, 1964.

W. J. Wehrli and Houston G. Williams, Casper, for appellants.

William H. Brown and Morris R. Massey, of Brown, Healy, Drew Apostolos & Barton Casper, for appellees.

Before PARKER, C. J., and HARNSBERGER, GRAY, and McINTYRE, JJ.

Mr. Justice McINTYRE delivered the opinion of the court.

Suit was filed in the District Court of Campbell County by True Oil Company for a declaratory judgment determining whether a certain oil and gas lease was valid and subsisting and whether the complainant was entitled to proceed, as a lessee, with drilling and development operations. The defendants were owners of the mineral rights in the land involved. Sinclair Oil & Gas Company and Shell Oil Company claimed rights under the lease. They were brought in as parties plaintiff on a counterclaim of the defendants.

The lease under consideration was originally given by Floyd E. Cook and Myrtle Cook, owners of the land, to C. A. Fleetwood. It covered 320 acres in Campbell County, being E½E½ of Section 7 and W½W½ of Section 8, Township 49 North, Range 70 West. The lease was dated September 15, 1952 and was for a primary term of ten years.

Subsequent to the giving of the lease defendants W. R. Gibson, Jr., Rex H. Baker, Thomas G. Dorough, H. P. Macauley and W. James Saul, through mesne conveyances, acquired interests in half of the mineral rights, the other half being retained by the Cooks. Also Sinclair succeeded to the rights of Fleetwood as lessee. Thereafter all rights under the lease, insofar as it pertained to the W½SW¼ of Section 8, passed to True and Shell, subject to certain outstanding royalty interests.

Following trial to the court without a jury, the district court found the lease terminated and entered judgment for defendants—the lessors and their successors in interest. The plaintiffs, as successors of the lessee, have appealed.

We are concerned with the question as to whether the lease is still in force and effect, or whether it has terminated by reason of the expiration of its term. Opposing parties have stipulated that midnight at the close of September 14, 1962 was the expiration time of the lease as far as its primary term is concerned.

Thus, it is agreed the lease is terminated, unless "the lessee" had commenced and was prosecuting drilling operations at the expiration of the primary term. Even if it be found that True had commenced and was prosecuting drilling operations, the defendants still question (1) whether True was actually a "lessee" under the lease at expiration time, as to the portion of the lease on which its well was being located; and (2) whether True had commenced drilling operations with a good-faith intention to complete the well.

The pertinent provisions of the lease for a determination of the issues involved are these:

"2. It is agreed that this lease shall remain in force for a term of ten (10) years from this date and as long thereafter as oil, gas, casinghead gas, casinghead gasoline or any of them is produced from said leased premises, or operations for drilling are continued, as hereinafter provided * * *."

"15. Notwithstanding anything in this lease contained to the contrary, it is expressly agreed that if during the primary term of this lease or at any time thereafter that this lease is in force by the production of oil, gas, or casinghead gas or casinghead gasoline after such primary term, if the lessee shall commence drilling operations during either of said periods, it shall remain in full force and effect and its term shall

continue as long as such operations are prosecuted and if production results therefrom, then as long thereafter as such production continues."

### True's Interest

The activities of True in connection with the commencement of a well on Cooks' land were performed pursuant to a farmout agreement being obtained from Sinclair and covering the remaining 240 acres held by it in the Fleetwood lease. The execution of instruments pertaining to this farmout were not completed until after the primary term of such lease had expired. In view of this situation, appellees contend True had no leasehold interest in the land being obtained from Sinclair, during the primary term.

Exhibits and undisputed testimony are in evidence which show that Sinclair's farmout agreement was executed by Sinclair as of September 10, 1962 and received by True on September 12. It is claimed by True that the proffered agreement contained "discrepancies," and amendments were required by True's letter dated September 13, 1962.

We consider these amendments substantial and material. They included among other things the following:

1. Sinclair was to waive the requirement for (actual) drilling to be commenced on or before September 14, 1962, and in lieu thereof agree that the staking of location on September 13 was sufficient.

2. Instead of the well being located in the center of the SE¼SE¼ of Section 7, Township 49 North, Range 70 West, it was to be at any location of True's choice in that forty-acre tract.

3. Instead of the requirement for an initial test well to test 200 feet into the Minnelusa formation or to a depth of 9,800 feet, whichever is less, True was to be entitled to complete the initial test well in any producing formation and defer the commencement of a subsequent well for 60 days after completion of the initial test well.

4. The proffered agreement reserved to Sinclair an overriding royalty of one-eighth except this was reduced to one-sixteenth as to production from the initial test well, until all costs on such well were recovered. One of True's amendments changed this so that the one-sixteenth applied to all production from the entire lease until all costs on the initial test well were recovered. Additionally, the amendment provided for a royalty thereafter of one-eighth "of the overriding royalty."

While the language in the last of these amendments is somewhat ambiguous insofar as it provides for a royalty of one-eighth of the overriding royalty, after costs on the test well were recovered, the assignment of lease which was executed by Sinclair and accepted by True provided for a royalty of one-sixteenth only on each well until the costs of that particular well were recovered, after which the royalty would be one-eighth for such well. This was indeed a material and substantial change from the agreement offered by Sinclair on September 10.

All of the amendments demanded by True were accepted and agreed to in writing by Sinclair September 18, 1962, the fourth day after the primary term of the Fleetwood lease had terminated. Plaintiffs (True, Sinclair and Shell) contend nevertheless that an oral agreement between True and Sinclair was reached prior to the expiration of the lease on September 14.

Without deciding whether, in view of our statute of frauds, such an oral agreement would be valid, we can say, if there was any evidence of an oral agreement having been reached, such evidence was effectively nullified by Sinclair's transmittal of its written acceptance. By separate letter, also dated September 18, 1962, Sinclair said it was returning a copy of True's letter dated September 13, 1962 covering amendments to the farmout agreement, which had been approved by Sinclair.

The letter then stated these changes are "being approved" in this particular agree-

ment because of the limited time in which to commence operations for the test well. In the future, Sinclair warned, it would not change certain of the provisions which were being changed in that instance. This statement can only mean that the amendments were "being approved" on September 18 and that they had not been approved previously. Or at least, the trier would have been warranted in arriving at such a finding of fact.

The evidence and all reasonable inferences therefrom must be construed by us in the light most favorable to appellees. However, even if such evidence were construed in a light favorable to appellants, it would still be inadequate to establish the consummation of a farmout agreement (either written or oral) between Sinclair and True, prior to expiration of the primary term of the lease in question.

It is true John E. Dobos, an attorney and landman for True, testified he called Larkin O'Hern, District Landman for Sinclair at Casper, on September 13, 1962 regarding the so-called discrepancies noted by True. He claimed that he and O'Hern "agreed" the modifications proposed by True "were in order." Not only was his testimony self-serving and hearsay in nature, but it constituted nothing more than the witness' conclusion as to what was agreed.

O'Hern's testimony concerning the conversation clearly negatived the idea that he committed Sinclair to any agreement. At first he claimed he called Sinclair's office in Denver and got approval for the modifications, "so then it was a matter of the paper work catching up with the activity." This was then qualified by his admission that he could only recommend; that such matters had to be reviewed in Denver; and that all he did was to transmit his recommendation to Denver.

Being more specific, O'Hern explained that the man he talked to in Denver on September 13 was C. S. Tinkler, Division Exploration Manager of Sinclair. He then testified Tinkler himself was not the man

who made ultimate decisions, but Tinkler assured O'Hern the changes "would be" approved and that Tinkler "would discuss it with Mr. Wright and get his approval." Thus, O'Hern's testimony fell far short of showing an immediate approval by R. A. Wright, who was Vice-President and Division Manager for Sinclair and the one whose duty it was to approve or reject the True amendments.

Clarence Peterson, a landman and contractman for Sinclair in Denver, testified Tinkler came to him about O'Hern's call and the proposed changes; that together they went to Wright, and Wright approved the changes—on September 13.

It is at this point that appellants' evidence, construed in its most favorable light, fails. It fails because there was nothing to show the acceptance made by Wright on September 13 was communicated to True prior to the written acceptance of September 18, which was signed by Wright. In fact, the only reasonable inference to be gathered from all the evidence touching on this subject is that Wright's acceptance was not communicated to True until September 18.

On that subject, O'Hern testified affirmatively that Wright responded "directly" to True, by Wright's letter of September 18, and O'Hern thereupon referred to September 18 as the "acceptance date." Being asked specifically whether he received any confirmation of the company's action on the True amendments other than a copy of Wright's acceptance on September 18, O'Hern replied "I frankly don't remember."

As to the necessity for an acceptance to be communicated in order to complete mutuality in a contract, we understand the rule to be as stated in 1 Williston on Contracts, Third Edition § 70, p. 230 (1957); and in 17 C.J.S. Contracts §§ 44 and 45, pp. 688–689, which is to the effect that in a bilateral contract, where the offeror asks that the offeree promise something, a communication of the acceptance in some manner is essential. Consequently, Sinclair's acceptance of the counteroffer contained in

True's September 13 letter would not be effective until communicated or put in the course of communication by an act on the part of Sinclair. This did not take place until September 18.

For cases which confirm and demonstrate the application of the rule which we follow on communication see the following: Commercial Casualty Ins. Co. v. Industrial Accident Commission, 116 Cal.App.2d 901, 254 P.2d 954, 958; Arnold v. Gramercy Company, 15 App.Div.2d 762, 224 N.Y.S.2d 613, 614, affirmed 12 N.Y.2d 687, 233 N.Y.S.2d 475, 185 N.E.2d 911; In re Estate of Russell 10 Wis.2d 346, 102 N.W.2d 768, 771; State Highway Department v. Wright Contracting Company, 107 Ga.App. 758, 131 S.E.2d 808, 813; Maloney v. Crest Finance Co., 39 Ill.App.2d 378, 188 N.E.2d 739.

■ What we have said seems sufficient, we think, to make it clear the trial court was justified in finding True had no farm-out agreement from Sinclair until September 18, 1962. Therefore, True was a mere volunteer and trespasser on the Fleetwood lease, as far as the location in the SE¼ SE¼ of Section 7 was concerned. True then was not, on or before September 14, 1962, a lessee as to such location, and under the provisions of the lease no one except "the lessee" could keep such lease alive by commencing drilling operations.

It is of interest to note that on the same day as Sinclair's final acceptance was communicated, September 18, 1962, True wrote a letter to Sinclair asking for written verification of their mutual agreement that operations could be discontinued on account of demands from the holders of mineral interests, and because the risk of failure was too substantial to permit the continuance of drilling operations. Sinclair did verify such agreement on September 24. True claims to have discontinued operations September 20, with a determination to file suit and test title.

*True's Intent*

In addition to the question as to whether True had a leasehold interest in the tract on which the Cook well was to be drilled, there is the further question as to whether drilling operations were timely commenced, with an unqualified and bona fide intention to complete such well.

The most that is claimed in the way of drilling operations during the primary term of the lease is the performance of these activities: The ordering of an abstract of title and obtaining of a title opinion; the survey of a location; the partial grading of a location; the making of an arrangement for surface damages and for the purchase of drilling water; the hauling of a load of line pipe for water to the location; and the commencement of the moving of a drilling rig from the State of Montana.

According to the testimony of True's attorney and landman, Dobos, such activities as were performed while negotiations were proceeding with Sinclair were performed knowingly on a "gamble" by True against the prospect that True would get a deal made with Sinclair acceptable to both sides. The trial court having found, as we assume it did, that no deal was completed with Sinclair until September 18, it could not, in the face of Dobos' admission, avoid finding as a matter of fact that True's gamble continued to September 18.

■ Hence, it follows that True up to that time did not have a bona fide and unconditional good-faith intention to complete the well. It intended to complete the well only in case negotiations with Sinclair turned out satisfactorily. That was not enough.

■ Preliminary activities such as are claimed here will be considered as a timely commencement of drilling operations only when there is present at the time of these preliminary activities a good-faith intention to complete the performance. Muth v. Aetna Oil Co., 7 Cir., 188 F.2d 844, 848–849, vacated 342 U.S. 844, 72 S.Ct. 73, 96 L.Ed. 638, Id. reinstated 7 Cir., 192 F.2d 1014, certiorari denied 342 U.S. 954, 72 S.Ct. 626, 96 L.Ed. 709; Butler v. Nepple, 54 Cal.2d 589, 6 Cal.Rptr. 767, 354 P.2d 239, 242–243; Illi-

nois Mid-Continent Co. v. Tennis, 122 Ind. App. 17, 102 N.E.2d 390, 394; Durbin v. Osborne, 292 Ky. 464, 166 S.W.2d 841, 843. See also 2 Summers, Oil and Gas, Ch. 11, § 349, pp. 461–466 (Perm.Ed.).

In Geier-Jackson, Inc., v. James, D.C. Tex., 160 F.Supp. 524, 530, the court said a lessee's intent to drill must be "unqualified." An intent to drill on the happening of certain contingencies, the court pointed out, such as favorable information gained from the drilling of another well or the making of favorable financial arrangements, would not be sufficient. In the case before us, by its own admission True's intentions of completing a well on the Cook location were qualified and contingent upon the success of its negotiations with Sinclair, and we have already made it clear that such negotiations carried past the primary term of the lease.

Courts have consistently refused to allow a lease to be held beyond its primary term where the evidence, as in this case, shows that preliminary activities toward the commencement of drilling operations are no more than a pretense and holding device to retain possession of the lease for speculative or other purposes. Butler v. Nepple, supra, at 354 P.2d 242–243; Illinois Mid-Continent Co. v. Tennis, supra, at 102 N.E.2d 394; Hughes v. Ford, 406 Ill. 171, 92 N.E.2d 747, 751; Muth v. Aetna Oil Co., supra, at 188 F.2d 849. See Robinson v. Gordon Oil Co., 258 Mich. 643, 242 N.W. 795, 797, where the lessee was considered to be in good faith on an affirmative finding that he was not holding the land for speculative purposes.

For cases which hold that a lessee cannot fail in the prosecution of drilling operations and hold an oil and gas lease for speculative or other purposes, unless the contract expressly grants such right and sufficient consideration has been paid therefor, see the following: Gregg v. Harper-Turner Oil Co., 10 Cir., 199 F.2d 1, 3; Baldwin v. Kubetz, 148 Cal.App.2d 937, 307 P.2d 1005, 1012; Town of Tome Land Grant v. Ringle Development Co., 56 N.M. 101, 240 P.2d 850, 852–853; Banks v. Calstar Petroleum

Co., 82 Cal.App.2d 789, 187 P.2d 127, 128; Rice v. Lee, 44 Cal.App.2d 909, 113 P.2d 235, 236–237.

In the lease before us, there is no express provision for the delay of drilling operations after expiration of the primary term, and no money or other consideration was paid or payable for such delay. Also there was evidence that True went immediately from the Cook location to a diagonal offset and drilled a test well on another lease. In the meantime, four oil companies which had agreed to support the Cook well with dry-hole contributions withdrew their commitments for such well and gave substantially the same commitments for the offset well.

From such evidence, the trial court would be entitled to believe that even after the Cook well was discontinued, True and its associates sought to hold the Cook land for speculative purposes, pending the outcome of the substitute well.

Appellants place much reliance on Fast v. Whitney, 26 Wyo. 433, 187 P. 192, 198. In that case, however, this court said specifically it could not be held as a matter of law that acts of a lessee, "if done in good faith and intending diligently to prosecute the work to completion," do not amount to the commencement of drilling operations. That is the same as saying the question as to whether lessee has acted in good faith, with a bona fide intention to diligently prosecute the work to completion, is one of fact for the trier.

In the case at bar Dobos admitted True was merely gambling on the hope of getting a farmout from Sinclair in time to save the lease. On that basis, the trial court was entitled to find there was not an unqualified and good-faith intention to prosecute the work to completion. True tries to claim the gamble ended with the obtaining of a farmout on September 13, but the evidence was such that the trial court was warranted in finding that True's gamble continued to September 18—Sinclair's acceptance date.

It appearing, therefore, that the trial court was justified in finding True had no farmout from Sinclair when the lease ex-

pired at midnight on September 14; and further justified in finding the Cook well was not timely commenced because True's preliminary activities were performed on a gamble and not with a good-faith intention of completing the performance, the judgment entered should be affirmed.

Affirmed.

Mr. Justice HARNSBERGER (dissenting).

The factual situation recounted by the majority opinion shows appellant True Oil Company was the owner of an interest in the Fleetwood lease insofar as the lease pertained to the W½SW¼ of Section 8. In other words, the lease-interest, as to 80 acres of the 320 acre tract, belonged to this appellant. As such interest-owner, this appellant had the right to commence drilling operations within the ten-year primary term of the Fleetwood lease and a duty to do so if this appellant desired to preserve its interest should the owner or owners of the remaining interest under the Fleetwood lease fail to commence drilling operations. So far as the lessor is concerned, this appellant's commencement of drilling operations on any part of the leased lands within the primary period would extend the lease during continuous drilling operations. The dividing among several parties of the lessee-interest was not the act of the lessor and did not alter the single obligation of the leasing party or parties to commence drilling operations before expiration of the primary term if the lease as an entity was to be extended beyond the primary term.

Even if this appellant was without right to commence drilling operations upon that part of the leased premises in which this appellant had no lease-interest, the only party entitled to complain about such drilling would be the owners of that part of the lease-interest, and it is clear that the owners do not and did not complain. The deadline of the primary term was extended whenever a drilling operation was commenced, in good faith, before expiration of that primary term, on any part of the leased premises by either of the several owners of any interest in the leasehold.

The majority attacks this appellant's timely commenced drilling operations because these operations were upon the 240 acre portion of the leased tract rather than being upon the 80 acre portion in which this appellant had an interest. However, the majority agrees that this appellant's operations "were performed *pursuant* to a farmout agreement being obtained from Sinclair [i. e., this appellant's co-interest owner] and covering the remaining 240 acres held by it in the Fleetwood lease." (Emphasis supplied.) This being true, inasmuch as the operations commenced were *pursuant* to an agreement with the owners of the leasehold interest in the 240 acres wherein the drilling operations of this appellant were commenced, this appellant's operation and its location were consented to by the owners of that portion of the leasehold prior to commencement of the drilling operation.

The majority brushes aside any question of the statute of frauds, and there is no disagreement with this because this appellant had the right to protect its interest by drilling upon any part of the leased premises as long as the owner of the interest in such part did not object.

The crucial point of difference this dissent raises is that an interest-owner under a lease where there are other interest-owners, all being lessee parties under a single leasehold, cannot lawfully be deprived of the right, within the terms of the lease, to preserve its interest, and if, in the effort to preserve such interest, compliance is made with the requirements necessary to extend the lease's primary term by commencement of drilling operations upon any part of the leased tract, the lease thereby becomes extended. In like manner, had the interest-owners of the 240 acre tract elected to commence their drilling operations upon this appellant's 80 acre tract before expiration of the primary term, the whole leasehold would have been extended so long as this appellant did not object and permitted the operation.