ELMER OELZE, JR., Plaintiff-Appellee, v. KEY DRILLING, INC., *et al.*, Defendants-Appellants.

Fifth District   No. 5—84—0477

Opinion filed June 27, 1985.

JONES, P.J., dissenting.

George W. Woodcock, of Woodcock, Kline & Kaid, P.C., of Mt. Carmel, for appellants.

Hohlt, House, DeMoss & Johnson, of Nashville (Clarence W. DeMoss, of counsel), for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Defendants, Key Drilling, Inc., Laura E. Struck and Robert A. Grosse appeal a judgment of the circuit court of Washington County invalidating a lease executed by Laura Struck in favor of Key Drilling, and decreeing as valid a prior lease executed by Ms. Struck in favor of plaintiff Elmer Oelze, Jr. The essential facts are not disputed.

On May 8, 1982, defendant Struck executed an oil and gas lease in favor of plaintiff. The lease was to remain in effect for one year and as long thereafter as oil or gas was produced from the land or as

long as drilling operations were sustained. Paragraph 12 of the lease contained the following provision:

"Notwithstanding anything in this lease contained to the contrary, it is expressly agreed that if lessee shall commence operations for drilling at any time while this lease is in force, this lease shall remain in force and its terms shall continue so long as such operations are prosecuted and, if production results therefrom, then as long as production continues."

In November 1982, plaintiff employed a surveyor to stake a well location on the premises. A drilling permit was issued to plaintiff on January 26, 1983. On May 6, 1983, plaintiff's employees began clearing trees and brush, leveled a well site, and dug slush pits. On May 9, 1983, Laura Struck, by her son-in-law, Robert Grosse, executed a second lease of the premises in favor of defendant Key Drilling. This lease was recorded the following day. On May 10, 1983, defendant Key Drilling took possession of the premises. Alleging that the first lease was still in effect by reason of plaintiff's preliminary drilling operations, plaintiff filed, on May 18, 1983, a complaint seeking to invalidate the second lease and enjoin defendant from any activities interfering with plaintiff's development of the land. Following a bench trial, the trial court entered judgment for plaintiff on June 27, 1984. From this judgment, defendants appeal. The issue presented is whether the activities of plaintiff in obtaining a drilling permit, clearing brush, leveling a well site and digging slush pits were sufficient to "commence operations for drilling" within the meaning of paragraph 12 of plaintiff's lease. The authorities indicate that this determination essentially hinges on plaintiff's good faith, *i.e.,* whether plaintiff possessed a *bona fide* intent to complete the well. The general principle is stated by Professor Summers:

"There are several provisions of an oil and gas lease which make it necessary to determine what constitutes the beginning or commencement of a well or of drilling or reworking operations. ***

The general rule seems to be that actual drilling is unnecessary, but that the location of wells, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the actual work of drilling, when performed with the bona fide intention to proceed thereafter with diligence toward the completion of the well, constitute a commencement or beginning of a well or drilling operations within the meaning of this clause of the lease. ***

8

*** [I]f there is doubt or controversy as to the intent of the lessee in performing the acts claimed as a commencement of operations, then the question should be submitted to the jury." (2 Summers, The Law of Oil & Gas sec. 349 (2d ed. 1959).) While courts have consistently refused to allow a lease to be held beyond its primary term where the evidence has shown that preliminary activities toward the commencement of drilling operations were no more than a pretense and holding device to retain possession of the lease for speculative or other purposes (*True Oil Co. v. Gibson* (Wyo. 1964), 392 P.2d 795, 800), such a determination is, as Professor Summers notes, one properly reserved for the trier of fact. The question in the instant case, therefore, is whether the trial court's determination of plaintiff's good faith was supported by the manifest weight of the evidence.

In finding that plaintiff's preliminary activities were not "a mere sham or *** activity to keep the lease alive," the court noted that the evidence indicated that plaintiff was a legitimate and prudent oil operator who had previously drilled several hundred wells, and that there was no showing that in any prior operation plaintiff had commenced preliminary drilling operations in bad faith. The acts performed by plaintiff, the court further noted, were standard procedures necessary to the commencement of drilling. The court further stated that the evidence indicated that plaintiff possessed the equipment and personnel to begin drilling operations during the final week of April 1983 and failed to initiate such operations only because of unfavorable weather.

█ Activities similar to those performed by plaintiff have been held sufficient to constitute good-faith commencement of drilling operations. (*Stoltz, Wagner & Brown v. Duncan* (W.D. Okla. 1976), 417 F. Supp. 552; *Jones v. Moore* (Okla. 1959), 338 P.2d 872; *Petersen v. Robinson Oil & Gas Co.* (Tex. Civ. App. 1962), 356 S.W.2d 217.) The determination of an operator's good faith is one dependent upon the totality of the circumstances of any given case considered in light of what reasonably would be expected by operators of ordinary prudence. (*LeBar v. Haynie* (Wyo. 1976), 552 P.2d 1107.) While the fact that an operator commences operations only a short time before the expiration of the lease may support a finding of bad faith (*e.g., Illinois Mid-Continent Co. v. Tennis* (1951), 122 Ind. App. 17, 102 N.E.2d 390), it does not compel such a finding. (*E.g., Jones v. Moore* (Okla. 1959), 338 P.2d 872; *Peterson v. Robinson Oil & Gas Co.* (Tex. Civ. App. 1962), 356 S.W.2d 217.) It is our judgment that the evidence before the trial court was sufficient to sustain a reasonable conclusion

that plaintiff had commenced drilling operations in good faith within the term of the lease.

The judgment of the trial court is accordingly affirmed.

Affirmed.

WELCH, J., concurs.

PRESIDING JUSTICE JONES, dissenting:

Oil field idiom has a phrase aimed at lessees holding leases with a soon-to-expire primary term that only drilling operations will save: "Dig or depart." The plaintiff in this case did neither.

As a matter of fact, the catch phrase has relevance only for coffee shop banter; it does not express the law on the issue. The law is as the majority expressed it, and I take no issue with that aspect of the majority opinion. The quotation from Summers is a good expression of the law, and it has been widely quoted in the large number of cases that have considered the question of what may constitute a commencement of drilling operations.

My disagreement with the majority lies with their interpretation of the facts and of the law as it is applied to those facts. Because of this disagreement, I respectfully dissent.

A reading of cases and text commentary on the subject indicates that, indeed, little is required to constitute the commencement of drilling operations that will serve to forestall the termination of a lease where "drilling operations" are required. However, there is a key ingredient in the formula, and that is that any commencement made must be with, as expressed in the quotation from Summers, "the bona fide intention to proceed thereafter with diligence." It is that key ingredient that is missing from this case.

Admittedly, if the preliminary acts performed by plaintiff had been performed with a *bona fide* intention to start drilling a well, and had been continued, they would have, under the cases, constituted sufficient commencement to have fulfilled plaintiff's obligation under the lease. But the evidence shows that such acts as were performed by plaintiff were not with a *bona fide* intention to proceed with diligence. In fact, the testimony of plaintiff himself, together with that of his employees, conclusively shows plaintiff's shortcomings in performance.

His lease was dated May 8, 1982. He had the location surveyed and staked for a well in November 1982, six months before expiration of the primary term. He applied to the State Department of Mines

and Minerals in December 1982 for a forced integration of his lease with one owned by defendant Key Drilling. A hearing was held in Springfield, the leases were ordered integrated and plaintiff was issued a permit to drill the well in question on January 26, 1983, about four months before the expiration of his lease's primary term. Defendant owned his own drilling rig, and between January and May of 1983 he moved this rig from Mascoutah to Woodlawn and drilled a well, and then stacked his rig. In making the move plaintiff took his rig within one or two miles of the drillsite in question. Plaintiff testified that he could have stopped and drilled on the Struck lease: "[If] that's what I wanted to do, I'm sure I could have."

The survey and the permit do not constitute drilling operations but are admittedly a necessary prelude to drilling. However, since they had been obtained so far ahead of the events in question, they have little bearing upon the intent with which the plaintiff's acts of May 1983 were performed.

On April 27, 1983, plaintiff sent his tool pusher (drilling superintendent) and his bulldozer operator to the lease for an inspection; it was too wet and muddy for operations. Following April 27 there was a lot of rain, so nothing further was attempted to be done at that time. On May 6, 1983, two days before the primary term expiration, he sent his tool pusher and bulldozer driver to the drillsite to "clear out a location for a drilling rig, dig the pits and we bring the rig in. And also a roadway which you have to have." The bulldozer was on location four to five hours and did some clearing of trees and dug one pit 20 to 25 feet long, 8 feet wide and $3\frac{1}{2}$ to 4 feet deep. Following this work on May 6, *the men left the drillsite, taking the bulldozer with them, and never returned thereafter.*

I think it must go as unquestioned that the foregoing acts do not show a *bona fide* intention to commence drilling operations and to proceed with diligence toward the completion of a well. The acts performed by plaintiff were symbolic only, a token and a makeshift. The only intent displayed by the plaintiff was an intent to hold the lease beyond its primary term, not to commence to drill a well. Strong affirmation of the lack of *bona fides* is found in the testimony of plaintiff and his employees. Plaintiff testified that, as paraphrased,

> "we sometimes dig as many as three pits but never less than two. I would have to have a second pit to drill this well. My men did not construct a roadway into this lease site. You [an operator] have to have a roadway into the lease site and that was not done. I didn't give any instructions for anyone to move on location or to do anything [following May 6]."

Plaintiff's tool pusher testified that on May 6, 1983, he and Ray (the bulldozer driver), as paraphrased,

"went to the drillsite and cleared the brush, leveled the location and dug a pit. We had no difficulty digging a pit or clearing the location. We didn't hang up. It wasn't too bad pushing trees out. The site was level enough to put a rig on. It is not necessary to make a roadway to make a location [for a bulldozer], but it is necessary to have a roadway into the lease site and that was not done."

In redirect testimony the tool pusher stated that "we would have had to do more clearing once we got the rig in there."

Plaintiff's bulldozer operator, called by defendants, testified that, again as paraphrased,

"for drilling a well I would dig three pits but I dug only one that day [May 6]. You [I] have to prepare a roadway in to a drillsite but we did not do it then."

It is thus seen that even those components of a drilling operation that plaintiff claims to have prepared on that date were incomplete and inadequate, as the foregoing testimony from plaintiff's side plainly indicates. The significant feature of plaintiff's performance on May 6 is that after spending four to five hours on the lease, the employees left, taking with them the very piece of equipment that would be needed to "proceed with diligence toward the completion of the well," and they never returned. If plaintiff had kept his men and bulldozer at work on the drillsite on and after May 6, then unquestionably he would have "commenced operations." But he did not.

As a contrast, an officer of defendant Key Drilling testified that defendant moved on the drillsite on May 10 with three bulldozers and 16 men and worked for 2½ days clearing location, digging the pits and building a road. Defendant had actually moved a rig onto the site and was in the process of upping derrick when stopped by plaintiff's injunction.

The defendants' actions show extraordinary diligence. Not nearly so much would have been required of plaintiff had he proceeded with what he had been doing. However, he did not proceed; he left, and took his bulldozer with him.

The cases relied upon by the majority do stand for the proposition for which they are cited. However, upon examination of the operations they describe, it will be seen that after the operators involved had performed a minimal amount of work, they proceeded in such a manner and to such an extent that a *bona fide* intent to complete the drilling of a well was shown. In short, once minimally commenced, the

operations were ongoing.

An Illinois Supreme Court case dealing with the very issue involved in this case is not cited by the majority, *Hughes v. Ford* (1950), 406 Ill. 171, 92 N.E.2d 747. That case makes plain, as do cases from other jurisdictions, that the lessor's interest is to be considered:

> "It is the policy of the law of Illinois, in dealing with oil-and-gas leases, that the same be construed in such manner as to do equity to both the lessor and the lessee." (406 Ill. 171, 178, 92 N.E.2d 747, 751.)

The facts of *Hughes* are on a parallel with those of this case, and its conclusion is relevant:

> "[F]rom his testimony it is apparent that nothing was attempted to be done by the defendant toward the actual drilling of the first well within the first two months' period and that he was mainly interested in merely holding the lease.
>
> * * *
>
> *** [I]t appears that the action taken in bringing in the water-drilling rig was merely an effort to hold the lease on a technical basis, and that defendant did not really intend to use this work in his oil well." (406 Ill. 171, 177-79, 92 N.E.2d 747, 751.)

Also see *Illinois Mid-Continent Co. v. Tennis* (Ind. 1951), 102 N.E.2d 390.

A good statement of the applicable rule is found in *Geier-Jackson, Inc. v. James* (E.D. Tex. 1958), 160 F. Supp. 524, 529:

> "Although actual drilling is not necessary in order to constitute the commencement of a well, there can be no commencement of a well within the meaning of an oil and gas lease unless work incident to the drilling of an oil and gas well is being performed with the good faith intention to pursue with diligence the drilling of a well to such depth as an ordinarily prudent operator would drill under the same or similar circumstances in search for oil or gas in paying quantities."

In the instance of this case, I believe the finding of the trial court was against the manifest weight of the evidence, and I would reverse.