1999-NMCA-066

981 P.2d 288

S.P. JOHNSON, III and Barbara Jo Johnson, Co–Trustees of the S.P. Johnson, III and Barbara Jo Johnson Trust and Patricia J. Cooper, Trustee of the Patricia J. Cooper Trust, Plaintiffs–Appellees/Cross–Appellants,

v.

YATES PETROLEUM CORPORATION, Yates Drilling Company, Abo Petroleum Corporation, and Myco Industries, Inc., Defendants–Appellants/Cross–Appellees.

No. 19,021.

Court of Appeals of New Mexico.

April 16, 1999.

Certiorari Denied, No. 25,739, May 25, 1999.

James T. Jennings, A.D. Jones, Jennings & Jones, L.C., Roswell, Ernest L. Padilla, Padilla Law Firm, P.A., Santa Fe, for appellees/cross-appellants.

Ernest L. Carroll, Mary Lynn Bogle, Losee, Carson, Haas & Carroll, P.A., Artesia, for appellants/cross-appellees.

## OPINION

ALARID, Judge.

{1} This is an appeal and cross-appeal from a district court order granting partial summary judgment in favor of each party. The dispute between the parties arose out of six oil and gas leases and the interpretation of provisions relating to the termination of the leases if certain requirements were not met. There are two issues presented by this appeal: (1) whether the trial court erred in granting summary judgment in favor of Plaintiffs S.P. Johnson, III and Barbara Jo Johnson, Co–Trustees of the S.P. Johnson, III and Barbara Jo Johnson Trust, and Pa-

tricia J. Cooper, Trustee of the PJC Revocable Trust, (collectively, the Johnsons), and ruling that two of the leases automatically terminated for failure on the part of Defendants Yates Petroleum Corporation, Yates Drilling Company, ABO Petroleum Corporation and Myco Industries, Inc. (collectively, Yates), to exercise due diligence in commencing and prosecuting drilling operations; and (2) whether the trial court erred in granting summary judgment in favor of Yates and concluding that four of the leases remained in force because the contract required them to drill only one well on each 160-acre proration unit. We reverse the trial court on the first issue and affirm on the second issue.

## PROCEDURAL BACKGROUND

{2} The Johnsons filed a complaint for a declaratory judgment seeking an order terminating six oil and gas leases owned by them as lessors, and Yates as lessees. Both parties filed motions for summary judgment. The trial court granted partial summary judgment in favor of the Johnsons, terminating two of the leases, and partial summary judgment in favor of Yates, maintaining four of the leases. Yates filed notice of appeal from the trial court's final order on November 17, 1997, and the Johnsons filed notice of appeal on November 19, 1997. Therefore, the Johnsons' appeal constitutes a cross appeal pursuant to Rule 12–201(B) NMRA 1999 (stating that "the party to file the first notice of appeal shall be deemed the appellant, and any opposing party filing a notice of appeal shall be a cross-appellant...."). We will summarize additional facts as we address the specific issues on appeal.

## DISCUSSION

### A. Standard of Review

{3} The appeals are subject to the same standard of review. Summary judgment is the appropriate remedy if the facts are undisputed and it is only the legal interpretation of the facts that remains. See Board of County Commissioners v. Risk Management Div., 120 N.M. 178, 179, 899 P.2d 1132, 1133 (1995). This Court "need not defer to the trial court's conclusions of law and, upon analysis of the record as established below, may reach a conclusion different from that of the trial court." C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 510, 817 P.2d 238, 244 (1991). The relevant facts in this case appear to be undisputed. Thus, we may decide the legal interpretation of the facts de novo. See Ramirez v. Ramirez 122 N.M. 590, 591, 929 P.2d 982, 983 (Ct.App.1996); see also Gallegos v. State of New Mexico Board of Education, et al., 1997–NMCA–040, ¶ 11, 123 N.M. 362, 940 P.2d 468 ("Our appellate courts are not bound by the conclusions of law reached by the trial court, and the applicable standard of review for such issues is de novo.").

### B. Yates' Appeal—Well Completion Clause

{4} The Johnsons executed six oil and gas leases in favor of Yates. Only two of the six leases are at issue in Yates' appeal. The pertinent language of the two leases is identical. The contract provided that the leases "shall be for a term of 3 years from this date (called "primary term") and as long thereafter as oil and gas is produced from said land or land with which said land is pooled hereunder." The contract for the leases was executed on March 15, 1990.

{5} The provision at issue is in the nature of a well completion clause (hereinafter "completion clause"). See generally Richard W. Hemingway, The Law of Oil and Gas §§ 6.6, 6.7 at 360–67 (3d. ed.1991) (discussing well completion clauses which propel the lease past the primary term by the commencement of drilling operations) (hereinafter Hemingway). It provided that if the lessee is engaged in drilling or reworking operations at the expiration of the primary term, the leases remain in force as long as drilling operations are prosecuted without cessation for more than sixty consecutive days. Specifically, the completion clause provided as follows:

If at the expiration of the primary term oil or gas is not being produced on said land, or from land pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon, or shall have completed a dry hole thereon within 60 days prior to the end of the primary terms, the lease shall remain in force so long as operations on said well or for drilling or reworking of any additional well are prose-

cuted with no cessation of more than 60 consecutive days, and if they result in the production of oil or gas so long thereafter as oil or gas is produced from said land, or from land pooled therewith.

{6}   The completion clauses at issue in Yates' appeal contain slightly different language.   Nevertheless, the actions required of the lessee to extend the leases beyond their primary term are essentially the same. *See Whelan v. Lacy*, 251 S.W.2d 175, 176–77 (Tex.Civ.App.1952) (relying on authority interpreting "commence to drill" in construing "engaged in drilling"); *Petersen v. Robinson Oil & Gas Co.*, 356 S.W.2d 217, 220 (Tex.Civ. App.1962) ("If drilling operations have 'commenced,' ... then lessee is 'engaged in drilling operations' ").

{7}   The undisputed facts are that prior to the expiration of the primary term of the lease, Yates had staked and surveyed the location, filed for and received a permit to drill a well and began to prepare and build the well location.   Specifically, the location of the well was staked on February 23, 1993. On March 1, 1993, Yates applied for a permit to drill the well, and on March 4, 1993, the application was approved.   Yates entered into an agreement with a contractor to have the location of the well prepared.   On March 13, 1993, the contractor hauled a bulldozer to the well location.   The contractor began clearing the brush and leveling the location on March 14, 1993.   Thereafter, from March 17 to March 21, 1993, the contractor leveled the location and began stripping top soil from the pit area.   The contractor continued working to build and prepare the roads and location for the well until April 2, 1993.   On April 7, 1993, the rig was moved to the well where it was continuously drilled.   The well was completed as a producing well on May 24, 1993.

{8}   Based on these undisputed facts, the trial court granted the Johnsons' motion for summary judgment, concluding that "Defendants failed to diligently prosecute, once commenced, drilling operations of the initial well (the Hooper Amp # 1)."   Yates contends this is based upon the court's conclusion that construction of the location occurred over a period of eighteen days, when there was evidence that a similar location could have possibly been built in approximately five days.   Yates argues that the trial court erred as a matter of law in concluding that the leases expired because Yates was engaged in drilling operations at the expiration of the primary term and there was no cessation of drilling operations for a period of sixty consecutive days, as provided under the leases. Yates asserts that the question of whether it commenced drilling operations before the expiration of the primary term is not at issue because the trial court specifically refused the Johnsons' request that their motion for summary judgment be granted "with respect to the timely commencement ... of drilling operations of the initial well."   Instead, the trial court adopted Yates' proposed order on the matter.   Therefore, Yates interprets the trial court's order as indicating that Yates commenced drilling operations prior to the expiration of the primary term, but that Yates failed to diligently prosecute drilling operations after the primary term.   In this regard, Yates asserts that the trial court erred as a matter of law by implying a covenant of due diligence to the continuation of operations after the expiration of the primary term because the lease terms spoke to the standard of diligence to be applied. Therefore, Yates contends that implying a covenant of due diligence conflicts with the plain language of the completion clause, which expressly provides a sixty-day-cessation-of-operations standard of diligence.

{9}   On the other hand, the Johnsons interpret the trial court's order as indicating that Yates failed to commence drilling operations prior to the expiration of the primary term.   They contend that the trial court's order expresses a conclusion on the issue of due diligence.   Thus, having failed to diligently prosecute drilling operations before the expiration of the primary term, as a matter of law, Yates was not "then engaged in drilling or reworking operations" such as to trigger an extension of the leases beyond their primary term.   The Johnsons acknowledge that the leases are silent with respect to "due diligence" and the actions required of the lessee to be engaged in drilling operations.   Nonetheless, the Johnsons contend

that because the leases are silent on these matters, the trial court appropriately implied a covenant of due diligence on Yates' drilling activities during the primary term. The Johnsons argue that because Yates did not diligently engage in drilling operations during the primary term of the lease, it cannot resurrect the lease by invoking the completion clause.

{10} In this regard, the Johnsons assert that because the issue of due diligence is a factual determination, this Court is bound by the trial court's determination that Yates failed to exercise due diligence in commencing drilling operations prior to the expiration of the primary term. In doing so, they cite a New Mexico case for the proposition that where the facts are undisputed but where reasonable minds may differ, the issue of "due diligence" in the context of a settlement agreement is a question of fact for the trial court. *Cf. Western Commerce Bank v. Gillespie,* 108 N.M. 535, 538, 775 P.2d 737, 740 (1989). We disagree. *Gillespie* is inapplicable because the procedural posture of that case is distinguishable. In *Gillespie,* the trial court was deciding a motion to enforce settlement. *See id.* at 537, 775 P.2d at 739. Therefore, the trial court acted as the trier of fact at an evidentiary hearing where testimony was presented. *See id.* at 538, 775 P.2d at 740. In contrast, the matter before the trial court in this case consisted of cross motions for summary judgment. Consequently, the trial court did not make findings, but applied the law to the undisputed facts submitted by the parties. *See Roth v. Thompson,* 113 N.M. 331, 334, 825 P.2d 1241, 1244 (1992) ("Summary judgment is proper if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law."). While the trial court's final order states that it "finds as follows," the paragraphs that follow are legal conclusions based on the undisputed facts. Thus, we reject the Johnsons' argument.

{11} In determining whether Yates' activities were sufficient to constitute the commencement of drilling operations, it appears that any activities in preparation for, or incidental to, drilling a well are sufficient. *See Geier–Jackson, Inc. v. James,* 160 F.Supp.

524, 529 (E.D.Tex.1958) ("The drilling operations referred to in the 60 day clause obviously mean operations incident to and connected with the drilling of a well for oil or gas."). "Although there is some limited authority to the contrary, in general it appears that the courts have been ready to find the commencement of operations (or the pursuit of drilling operations) where only the most modest preparations for drilling have been made." Howard R. Williams & Charles J. Meyers, 3 *Oil and Gas Law* § 618.1 at 320–21 (1998) (footnotes omitted) (hereinafter Williams & Meyers).

{12} The leases provided that Yates could continue drilling operations engaged in at the end of the primary term, or conduct additional operations, so long as not more than 60 consecutive days elapsed during which there was a cessation of operations. The work performed by Yates prior to the expiration of the primary term constituted drilling operations, in accordance with the completion clause. The undisputed facts demonstrate that Yates staked and surveyed the location, applied for and received a permit to drill the well, and began preparing and building the well location prior to the expiration of the primary term. These activities have been held to be sufficient to constitute the engagement and commencement of drilling operations. *See, e.g., Petersen,* 356 S.W.2d at 219–20 (hiring contractor to drill well, employing surveyor to survey well, and staking and leveling well location constituted engagement in drilling operations); *Oelze,* 90 Ill.Dec. 1, 481 N.E.2d at 802–03 (holding that "obtaining a drilling permit, clearing brush, leveling a well site and digging slush pits" functioned as commencement of drilling operations); *D'Lo Royalties, Inc. v. Shell Oil Co.,* 389 F.Supp. 538, 549 (S.D.Miss.1975) (stating that preliminary site work commenced prior to expiration sufficient to extend lease), *aff'd Campise v. Hamilton,* 541 F.2d 279 (5th Cir.1976). Therefore, Yates contends that implying a requirement of due diligence into the contract after the primary term would be inconsistent with the provision to which the parties expressly agreed. *See Continental Potash, Inc.,* 115 N.M. at 704, 858 P.2d at 80 ("The general rule is that an

implied covenant cannot co-exist with express covenants that specifically cover the same subject matter.").

{13} Even assuming a requirement of reasonable diligence in addition to the 60–day provision, we hold that the work performed by Yates was sufficient, as a matter of law, to constitute the commencement of drilling operations under the lease. The Johnsons emphasize the evidence that preparation of the well location could have been completed earlier, that Yates told their contractor not to be in any hurry, and that the drilling rig ultimately used to drill the well was under contract to Yates to drill a well at another location. Yates points out that the drilling rig scheduled to drill the well in question was not available until April 6, 1993, when it was placed on the location, and the well was spudded. Thus, Yates asserts that even if the construction of the location had been completed in five days, drilling could not, in any case, commence until April 6, 1993. Consequently, we reverse the trial court and hold that the two leases in question remain in force.

**C.** *The Johnsons' Appeal—Allocation of Land to a Well Unit*

{14} The Johnsons contend that drilling one well per 160–acre proration or spacing unit did not satisfy Yate's drilling obligations under the lease, and therefore, four of the six leases automatically terminated. The leases contained the following special provision as an addendum to the leases (hereinafter referred to "Paragraph 12"):

NOTWITHSTANDING anything contained in this lease to the contrary:

At the expiration of the primary term hereof, this lease shall terminate as to all lands covered hereby not included in or otherwise allocated to a "well unit" as hereinafter defined, unless Lessee is producing oil, gas or other hydrocarbons from any well on the leased premises or is drilling upon said lands across the expiration of the primary term as provided for in the body of the lease, and does not allow more than 120 days to elapse between the completion or abandonment of one well on such land and the commencement of another

well thereon until the leased premises have been "fully developed", as hereinafter defined. Operations for drilling of the first such development well must be commenced (a) within 120 days after the expiration of the primary term if production is established on this lease prior to the expiration of the primary term, or (b) within 120 days of completion of the well which is being drilled, tested, or completed across the expiration of the primary term. Should Lessee fail to timely commence a well in accordance with the aforesaid 120 days continuous drilling or development program prior to the point in time the lease premises have been fully developed then this lease shall terminate as to all lands not included in or otherwise allocated to a well unit. For the purpose hereof, the term "well unit" shall mean the proration or spacing unit created for a well capable of producing oil and/or gas or other hydrocarbons in paying quantities as in accordance with the applicable rules and regulations of the governmental authority having jurisdiction, and the term "fully developed" shall mean the point in time when the entirety of the leased premises has been included in a well unit or units as defined. At the end of the continuous development program, if any, this lease will automatically terminate as to all lands covered hereby which have not been so fully developed, and as to lands so fully developed shall terminate as to all depths lying more than 100 feet below the base of the deepest producing formation.

{15} Neither party disputes that the governmental authority in this case, the Oil Conservation Division (hereinafter "OCD"), created proration or spacing units (hereinafter "proration units") of 160 acres. However, the Johnsons assert that to give effect to Paragraph 12, this Court must consider the intent of the clause and the parties, as well as the surrounding circumstances. However, "[w]hen discerning the purpose, meaning, and intent of the parties to a contract, the court's duty is confined to interpreting the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new

agreement for the parties." *CC Housing Corp. v. Ryder Truck Rental, Inc.*, 106 N.M. 577, 579, 746 P.2d 1109, 1111 (1987); *accord Montoya v. Villa Linda Mall, Ltd.*, 110 N.M. 128, 129, 793 P.2d 258, 259 (1990). Paragraph 12 clearly states that the lease shall terminate as to all lands not allocated to a "well unit," and expressly defines a "well unit" as the proration unit created by, in this case, the OCD. It is without dispute that the OCD created proration units of 160 acres. Therefore, the contract is clear and unambiguous, and we will not imply terms and construct an agreement for the parties. *See Richardson v. Farmers Ins. Co. of Arizona*, 112 N.M. 73, 74, 811 P.2d 571, 572 (1991) ("A contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions.").

{16} The Johnsons maintain that their intent was to require Yates to follow the customary development for oil production and drill one well per 40 acres. Specifically, the Johnsons assert that OCD increased oil allowables or production limits for 160–acre proration units, rather than reduce the size of the proration units. They contend that the resulting drilling pattern in the North Dagger Draw Pool, where the leased land is located, has been on a 40–acre basis. However, Paragraph 12 does not require Yates to conform to the customary development or drilling pattern for oil production in that region.

{17} In addition, the Johnsons assert that for a proration unit to be fully developed, as required by Paragraph 12, the unit must have been developed on a 40–acre basis. However, the leases do not require Yates to "fully develop" the 160–acre proration units by drilling on a 40–acre basis. Rather, the express language of Paragraph 12 required Yates to allocate leased land to a well unit in accordance with the OCD regulations which, it is undisputed, created proration units of 160 acres. It is also undisputed that Yates allocated the leased land to 160–acre proration units, in accordance with OCD regulations. Absent express language in the leases requiring what the Johnsons are asserting, their argument is unpersuasive. If the Johnsons intended to require a drilling pattern of one well per 40 acres, they should have included language to this effect in Paragraph 12.

{18} Moreover, the portion of Paragraph 12 requiring the land to be "fully developed" is inapplicable under the facts of the case. The portion of Paragraph 12 relied upon by the Johnsons begins with the term "unless," and provides alternative means of avoiding the termination of the leases. In other words, if Yates did not have the land allocated to 160–acre proration units, they could save the leases from termination by satisfying one of the two other alternatives following the term "unless." The alternative means of saving the leases from termination include (1) if the lessee is producing oil, gas, or other hydrocarbons from any well on the leased premises, or (2) if the lessee is drilling after the expiration of the primary term, without more than 120 days elapsing between the completion or abandonment of one well and the commencement of another well, until the leased premises have been "fully developed," which is defined as the point in time when the entire leased land has been included in a well unit or units. Because Yates satisfied Paragraph 12 by allocating the land to 160–acre proration units, however, these alternatives were inapplicable.

{19} The Johnsons further contend that the trial court's interpretation of Paragraph 12 renders it meaningless in light of the pooling provisions contained in the leases. The leases have different pooling provisions, one of which provided:

Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease, or any portion thereof as to oil and gas, or either of them, with other land, lease or leases in the immediate vicinity thereof to the extent, hereinafter stipulated, when in the Lessee's judgment it is necessary or advisable to do so in order properly to explore, or to develop and operate said leased premises in compliance with the spacing rules of the New Mexico Oil Conservation Commission, or other lawful authority or when to do so would, in the judgment of Lessee, promote the conservation of oil and gas in and under and that may be

produced from said premises. Units pooled for oil hereunder shall not substantially exceed 40 acres each in area, and units pooled for gas hereunder shall not substantially exceed in area 640 acres each plus a tolerance of 10% thereof, provided that should governmental authority having jurisdiction prescribe or permit the creation of units larger than those specified, units thereafter created may conform substantially in size with those proscribed by governmental regulations.

The other pooling provision provided:

Lessee is hereby granted the right and power, from time to time, to pool or combine this lease, the land covered by it or any part or horizon thereof with any other land, leases, mineral estates or parts thereof for the production of oil or gas. Units pooled hereunder shall not exceed the standard proration unit fixed by law or by the Oil Conservation Division of the Energy and Minerals Department of the State of New Mexico or by any other lawful authority for the pool or area in which said land is situated, plus a tolerance of ten percent.

{20} The Johnsons maintain that both pooling provisions limit the size of a pooled unit to the standard proration unit of 160 acres, as established by the OCD. The leases in question covered no more than 60 acres. Therefore, the Johnsons assert that Yates could have saved the leases in their entirety by relying solely on the pooling provisions, thereby rendering Paragraph 12 meaningless. In response, Yates contends that while in some sections of the leased lands, the acreage consisted of a single tract, two other sections consisted of two small tracts contained in different proration units. Thus, the purpose of Paragraph 12 was to require production in both proration units. Although the language of Paragraph 12 was contained in all of the six leases, it served a purpose as to at least some of the leases.

{21} The Johnsons further contend that irrespective of the maximum allowables or production limits established by the OCD, under Paragraph 12, Yates was required to drill four wells per 160–acre proration unit to achieve ultimate recovery from each 160–acre proration unit. They maintain that if proration units are not drilled on a 40–acre basis, unrecovered oil is left in the ground. The Johnsons acknowledge that to comply with OCD production limits, the combined production of the four wells must be added together to obtain the figure used for determining production limits. Consequently, the Johnsons argue that to comply with the OCD's production limits, it would be necessary to curtail production of one well to allocate production to each of the other wells drilled on a 40–acre basis. However, it seems unreasonable to interpret the leases as requiring the lessee to continue drilling once one well on the lease has produced the production limits for the 160–acre proration unit. *Cf. Rummel v. Lexington Ins. Co.*, 1997–NMSC–041, ¶ 27, 123 N.M. 752, 945 P.2d 970 (stating that rules of contract construction prohibit an absurd interpretation of contract terms). Similarly, it would seem unreasonable to interpret the leases as requiring Yates to cut back production of one well in order to allocate resources and production to three additional wells drilled on a 40–acre basis. In any event, the language of the contract does not support Johnsons' interpretation.

{22} Finally, the parties dispute Yates' position regarding maximum allowables and down spacing of proration units in OCD hearings, which took place prior to the execution of the contracts at issue. Essentially, the Johnsons contend that Yates maintains a position in this case inconsistent with that taken at OCD hearings, and therefore, Yates is judicially estopped from asserting the position maintained on appeal. As stated in *Citizens Bank v. C & H Constr. & Paving Co.*, 89 N.M. 360, 366, 552 P.2d 796, 802 (Ct.App. 1976):

"Judicial estoppel" simply means that a party is not permitted to maintain inconsistent positions in judicial proceedings. Where a party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formally taken by him.

Even were we to apply the doctrine to OCD hearings, it would not apply here. Johnson has not explained how Yates took any position before the OCD regarding the interpretation of its contract with Johnson. Moreover, it does not appear that Yates succeeded in its position before the OCD. Consequently, we reject this argument. Similarly, the history of the OCD regulations is also irrelevant, since the express language of the contract controls, absent any ambiguity. Therefore, we affirm the district court's conclusion that the leases developed at one well per 160–acre proration unit remain in force.

*CONCLUSION*

{23} The undisputed evidence supports the conclusion that prior to the expiration of the primary term of the lease, Yates set into motion the process of drilling a well, and that such acts preliminary to the actual work of drilling were performed with diligence to the completion of the well. Therefore, we reverse the trial court's determination and hold that the two leases did not terminate by reason of Yates' failure to begin and prosecute drilling operations, as required under the completion clause of the leases. In addition, the undisputed evidence supports the trial court's conclusion that Yates allocated leased land to 160–acre proration units, as set by the OCD, and in accordance with the express provisions of the leases. Consequently, we affirm the trial court's determination that the four leases at issue in Johnsons' appeal remained in force. As the prevailing party, Yates is entitled to costs incurred in responding to the Johnson's cross appeal. See Rule 12–403(A) NMRA 1999.

{24} **IT IS SO ORDERED.**

APODACA and HARTZ, JJ., concur.