# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2018-NMSC-016

Filing Date: February 15, 2018

Docket No. S-1-SC-36225

ENDURO OPERATING LLC,

       Plaintiff-Respondent,

v.

ECHO PRODUCTION, INC.; TALUS, INC.;
TWIN MONTANA, INC.; CIMARRON RIVER
INVESTMENTS, LLC; CMW INTERESTS, INC.;
D2 RESOURCES, LLC; ELGER EXPLORATION
INC.; PLAINS PRODUCTION, INC.; SOLIS
ENERGY LLC; THE ALLAR COMPANY;
KEN SELIGMAN; and W. GLEN STREET, JR.,

       Defendants-Petitioners.

**ORIGINAL PROCEEDING ON CERTIORARI**
Lisa B. Riley, District Judge

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward R. Ricco
Albuquerque, NM

Cotton, Bledsoe, Tighe & Dawson, P.C.
Jared Mark Moore
Terry W. Rhoads
Midland, TX

Michael J. Henry, Attorney at Law, P.C.
Michael J. Henry
Forth Worth, TX

for Petitioners Echo Production, Inc.; Talus, Inc.; Twin Montana, Inc.; Cimarron River Investments, LLC; CMW Interests, Inc.; D2 Resources, LLC; Elger Exploration, Inc.; Plains Production, Inc.; Solis Energy LLC; The Allar Company; and W. Glenn Street, Jr.

McCormick, Caraway, Tabor & Byers, L.L.P.
Cas. F. Tabor
Albuquerque, NM

for Petitioner Ken Seligman

Hinkle Shanor LLP
Andrew J. Cloutier
Parker B. Folse
Roswell, NM

for Respondent

**OPINION**

**CHÁVEZ, Justice.**

**{1}**    Echo and Enduro are two of several parties to a joint operating agreement[1] (JOA). Under the JOA, Echo, as a party wishing to undertake a new drilling project, had to provide notice of the proposed project to the other parties to the JOA, who then had thirty days to decide whether to opt in or out of the project. By opting in, a party agrees to share in the cost and risk of the project. If a party opts out of the project—as Enduro did in this case—then the party is deemed "non-consenting," and is exempt from any of the cost or risk associated with the new project, but cannot share in any of the profits from the new project until the consenting parties have recovered four-hundred percent of the labor and equipment costs invested in the new project. For the consenting parties to recover the nonconsenting parties' forfeited share of profits, the consenting parties must "within ninety (90) days after the expiration of the notice period of thirty (30) days . . . actually commence the proposed operation and complete it with due diligence." Together, the JOA's provisions provide the consenting parties with 120 days after proposing the project to "actually commence" the operation, which in this case is the drilling of an oil well. If the consenting parties do not commence the proposed operation within 120 days, but one or more of them "still desires to conduct said operation," then the parties wishing to proceed with the operation must repropose the operation to the nonconsenting parties "as if no prior proposal had been made."

**{2}**    The question before us is what activities are adequate as a matter of law to satisfy the contractual requirement that a consenting party actually commence the drilling operation. The Court of Appeals in *Johnson v. Yates Petroleum Corp.*, 1999-NMCA-066, ¶ 11, 127

---

[1]The substance of the parties' JOA was adopted, with slight modification, from a model form published by the American Association of Petroleum Landmen (A.A.P.L.) Form 610-1982.

2

N.M. 355, 981 P.2d 288, held that "any activities in preparation for, or incidental to, drilling a well are sufficient" even if "only the most modest preparations for drilling have been made." (internal quotation marks omitted) (citing Howard R. Williams & Charles J. Meyers, 3 *Oil and Gas Law* § 618.1 at 320-21 (1998)). In *Johnson*, the Court of Appeals found the following combination of activities adequate as a matter of law to satisfy the actual commencement requirement: (1) staking and surveying the location, (2) filing for and receiving a permit to drill a well, (3) entering into an agreement with a contractor to have the location of the well prepared for drilling, and (4) beginning the clearing of brush and the leveling of the area. *Id*. at ¶ 7.

**{3}** In its opinion below, the Court of Appeals concluded that the language in *Johnson* indicating that "any" preparatory activities would be sufficient was too permissive. *See Enduro Operating LLC v. Echo Prod., Inc.*, 2017-NMCA-018, ¶¶ 25, 29, 388 P.3d 990. The Court of Appeals was persuaded that Echo's lack of on-site activity at the proposed well site, other than surveying and staking, and lack of a permit to commence drilling was evidence as a matter of law that Echo had not actually commenced drilling operations. *Id*. ¶¶ 22, 29. The Court of Appeals reversed the district court's grant of summary judgment in favor of Echo and remanded for an entry of summary judgment in favor of Enduro. *Id*. ¶ 31. We reverse the Court of Appeals and hold that the failure to obtain an approved drilling permit within the relevant commencement period is not dispositive. A party may prove that it has actually commenced drilling operations with evidence that it committed resources, whether on-site or off-site, that demonstrate its present good-faith intent to diligently carry on drilling activities until completion.

## I.    DISCUSSION

## A.    Commencement of Operations

### 1.    A party has commenced operations if it engages in actions that demonstrate a present good-faith intent to diligently carry on drilling activities until completion

**{4}** When resolving a dispute over the meaning of terms in a contract, our goal is to "ascertain the intentions of the contracting parties with respect to the challenged terms at the time they executed the contract." *Strata Prod. Co. v. Mercury Expl. Co.*, 1996-NMSC-016, ¶ 29, 121 N.M. 622, 916 P.2d 822. "[I]f the parties attached different meanings to [disputed] language, the court's task is the more complex one of applying a standard of reasonableness to determine which party's intention is to be carried out at the expense of the other's." Allan E. Farnsworth, *Farnsworth on Contracts* 285 (3rd ed. 2004). To determine the reasonable construction of contract terms, "[w]ords and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." Restatement (Second) of Contracts § 202 (1981).

**{5}** Cases interpreting the meaning of commencement clauses in the context of oil and

3

gas lease agreements provide insight into how we should construe the commencement clause in the parties' JOA. Only a Texas court has interpreted the meaning of the commencement provision in the model-form JOA used by the parties in this case, and the Texas court also relied on several lease agreement cases to determine the meaning of "actually commence" under the model-form JOA. *See Valence Operating Co. v. Anadarko Petroleum Corp.*, 303 S.W.3d 435, 438-41 (Tex. App. 2010).

**{6}**     In the context of lease agreements, the majority rule is that a party has commenced where "modest preparations for drilling have been made" so long as the preparations are "part of a good-faith effort to obtain production." *See* 3 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers Oil and Gas Law*, § 618.1 at 319, 321 (2016). Although actual drilling would obviously suffice as evidence of "actual commencement," actual drilling is not required. *See* Eugene Kuntz, *A Treatise on the Law of Oil and Gas*, § 32.3(b) at 75 & n.4 (1989) (collecting cases supporting the proposition that "it is generally held that acts which are preparatory to drilling are sufficient to constitute the commencement of a well and that it is not essential that the lessee be in the process of making a hole").

**{7}**     Preparatory activity at the well site is also sufficient to prove that a drilling operation has actually commenced. As one treatise explained:

> Where the lessee has the ability to drill the well to completion and the lessor can make no showing the lessee lacks a present intent to diligently carry on drilling activities until completion, very little in the way of physical activities must be performed on the site to support a conclusion that the lessee has commenced operations . . . . A minimum of physical activities seems to include the staking of the well site plus some acts on the land itself such as leveling the site and digging slush pits.

Owen L. Anderson, et al., *Hemingway Oil and Gas Law and Taxation*, § 6.7 at 293 (4th ed. 2004). *See also, e.g.*, *Duffield v. Russell*, 1899 WL 1336, at *2 (Ohio Cir. Ct. May 1899), *aff'd*, 63 N.E. 1127 (1902) (holding that a party demonstrated commencement where on the last day of the commencement period it staked the well and cut a "portion of the timber" to be used for the drilling rig); *Petersen v. Robinson Oil & Gas Co.*, 356 S.W.2d 217, 219-20 (Tex. Civ. App. 1962) (holding that a party demonstrated commencement where it staked the well and, on the last day of the commencement period, moved a maintainer onto land and spent two hours leveling the well location). In each of these cases, the commitment of resources at the drilling site was sufficient evidence to prove the operator had actually commenced drilling operations because the evidence proved the operator's present good-faith intent to diligently carry on drilling activities until completion. Other cases have found a combination of on-site and off-site activity was adequate to prove that an operator has commenced drilling activities. *See Kaszar v. Meridian Oil & Gas Enters., Inc.*, 499 N.E.2d 3, 4-5 (Ohio Ct. App. 1985) (holding that a party demonstrated commencement where it staked the well, cleared the well site, and filed paperwork with the Securities and Exchange Commission); *Jones v. Moore*, 338 P.2d 872, 874-75 (Okla. 1959) (holding that a party

4

demonstrated commencement where on the last day of the commencing period it staked the well, dug a slush pit, and signed equipment contracts).

**{8}** The question we must still answer is whether the off-site commitment of resources can ever be adequate evidence of the parties' present good-faith intent to diligently carry on drilling activities until completion where the only on-site activity was the surveying and staking of the well. In its opinion, the Court of Appeals relied heavily on the *Valence* case to discount the evidentiary value of off-site activities. *See Enduro*, 2017-NMCA-018, ¶ 26. The *Valence* court held that when "there is doubt or controversy as to the intent of the party claiming to have commenced operations for drilling by performing preparatory acts, the question is one of mixed law and fact and should be submitted to the jury." 303 S.W.3d at 441. More importantly, the *Valence* court held that the following "'backroom preparations' . . . with no on-site activity except a preliminary staking of wells" were not sufficient, as a matter of law, to prove the party had actually commenced drilling operations: (1) preparing an authorization for expenditures, (2) receiving a topographic map of the well locations, (3) staking locations, (4) photographing the well sites, (5) obtaining a preliminary list of instruments regarding title, (6) holding several meetings to discuss locations and how to build on the locations, (7) preparing detailed cost and facility estimates for all wells, (8) preparing preliminary run sheets, and (9) obtaining drilling permits for all four wells. *Id*. at 440. Instead, it was for the jury to determine whether these activities "showed a bona fide intent to commence actual work on the proposed operation before the deadline and proceed with diligence to the completion of the wells." *Id*. at 441.

**{9}** Importantly, in *Valence*, the operator had not signed drilling contracts, built access roads, restaked the well locations, secured title opinions, and had not actually begun drilling, before the deadline for actually commencing the drilling operation. *Id*. at 440. Although the *Valence* court made it clear that "[a]ctual drilling is not necessary in order to comply with an obligation to commence operations for drilling," *id.*, we do not know if the *Valence* court would have held that proof of one or more of the latter activities was sufficient as a matter of law to prove commencement.

**{10}** Building access roads and/or restaking well locations involves the commitment of resources. And, as one commentator explained, the focus of a commencement clause is on whether a party has taken actions that amount to an "irrevocable commitment to conduct operations, to completion, on the lease land. The best evidence of this, absent actual drilling of the premises, is an enforceable contract with a third party to drill a well on the leased land." Martin & Kramer, *supra*, § 618.1 at 318-19 n.10.2 (quoting 1 D. Pierce, *Kansas Oil and Gas Handbook* 9.34 (1991)). We agree that an enforceable drilling contract that commits an operator's resources is sufficient evidence, as a matter of law, to establish that the operator actually commenced drilling operations, even in the absence of on-site activities.

**{11}** We also conclude that a drilling permit is not essential for an operator to prove that it actually commenced drilling operations. The Court of Appeals overemphasized the

5

importance of obtaining an approved drilling permit within the commencement deadline. The Court relied on a provision in the New Mexico Administrative Code (NMAC) stating that the purpose of the drilling permit rules was to "require an operator to obtain a permit *prior to commencing* drilling" and concluded that it would be condoning unpermitted drilling by deciding that a party could commence operations without a permit. *Enduro*, 2017-NMCA-018, ¶ 22 (quoting 19.15.14.6 NMAC) (internal quotation marks omitted). One jurisdiction has held that commencement cannot occur without a permit. *See Goble v. Goff*, 42 N.W.2d 845, 846-47 (Mich. 1950). However, the Texas Court of Appeals, in a later case dealing with language similar to the language in New Mexico's permit regulations, declined to follow *Goble* and concluded that the absence of a permit would not preclude a determination that a party commenced operations. *Gray v. Helmerich & Payne, Inc.*, 834 S.W.2d 579, 582 (Tex. App. 1992). The court's reasoning in *Gray* is persuasive.

**{12}** In *Gray,* the court held that the language in the Texas Administrative Code should not control the meaning of the language in the party's contract because the code and the contract were drafted to serve different purposes. *Id.* The court explained that an oil and gas lease is a private agreement between two parties that is designed to allocate property rights between the lessor and lessee. *See id.* By contrast, the *Gray* court concluded that the Texas Administrative Code provision, which states that "[o]perations of *drilling* . . . shall not be commenced until the *permit* has been granted," was designed to carry into effect the state's conservation laws. *Gray*, 834 S.W.2d at 579, 582 (omission original) (quoting 16 Tex. Admin. Code § 3.5(c)).

**{13}** The difference in purpose between the NMAC provisions and the JOA provisions convinces us that the intended meaning underlying the phrase "actually commence the proposed operations" in the JOA is different from the phrase "commencing drilling" in the NMAC. The NMAC requires a party to file a "[r]eport of commencement of drilling operations" within ten days following "commencement" and the report "shall indicate the hour and the date the operator spudded[2] the well." 19.15.7.14(C) NMAC. The majority of cases that have looked at commencement clauses in private contracts have found that actual spudding is not required. *See, e.g.*, Kuntz, *supra*, § 32.3(b) at 75 & n.4 (1989). Hence, the language in the JOA was not only designed to serve a different purpose than the language in 19.15.14.6 NMAC but was also likely used with a different intended meaning.

**{14}** Several courts have upheld findings of commencement when the party had not obtained a drilling permit within the primary term. *See Henry v. Chesapeake Appalachia, L.L.C.*, 739 F.3d 909, 912-13 (6th Cir. 2014); *Cason v. Chesapeake Operating, Inc.*, 47,084 pp. 10-11 (La. App. 2 Cir. 4/11/12), 92 So.3d 436, 442-43; *Gray*, 834 S.W.2d at 582. We also note that even if Echo's drilling permit was approved prior to the deadline, it would have said little about its concurrent good-faith intent to diligently carry on drilling activities

---

[2]Spudding in is defined as "[t]he first boring of the hole in the drilling of an oil well." 8 Martin & Kramer, *supra*, at 996 (2017).

6

until completion because the permit was valid for two years and did not require the spudding of a well within any particular time period.

**{15}** Without a clear indication in the JOA that the parties intended to require a permit before a party can demonstrate commencement, the language in the NMAC should not control the meaning of the JOA. Here, as in *Gray*, we conclude that the JOA and the NMAC serve different purposes. The JOA that the parties used was adopted from a model form "commonly used in the oil and gas industry in New Mexico and other producing states to set forth the arrangement between interest owners as to exploration and development of jointly owned interests." *Nearburg v. Yates Petroleum Corp.*, 1997-NMCA-069, ¶ 2, 123 N.M. 526, 943 P.2d 560 (discussing A.A.P.L. Form 610–1977). Its purpose is to allocate rights and responsibilities between the individual parties, whereas the purpose of NMAC permitting requirements is to carry out the commission's duty to promulgate rules relating to "the conservation of oil and gas and the prevention of waste of potash as a result of oil or gas operations in this state." NMSA 1978, § 70-2-6(A) (1979). Accordingly, we disagree with the Court of Appeals and hold that when an operator has applied for but has not obtained an approved drilling permit within the commencement period, the operator is not precluded from relying on other activities to demonstrate that it actually commenced drilling operations.

**{16}** In summary, unless the parties include language in their contract indicating otherwise, to prove that an operator has actually commenced drilling operations: (1) actual drilling is conclusive proof, but is not necessary, (2) obtaining a permit is not essential, (3) activities such as leveling the well location, digging a slush pit, or other good-faith commitment of resources at the drilling site will suffice as evidence of the parties' present intent to diligently carry on drilling activities until completion, and (4) the off-site commitment of resources, such as entering into an enforceable drilling contract requiring the diligent completion of the well, will also suffice as evidence that the operator actually commenced drilling operations. With these principles in mind we turn next to consider the summary judgment motions in this case.

## 2. Decisions to grant summary judgment motions are reviewed de novo

**{17}** Almost four years after Echo sent notice of its proposed well operation Enduro filed a complaint against Echo and the other defendants for breach of contract, conversion, violation of the Oil and Gas Proceeds Payment Act under NMSA 1978, Sections 70-10-1 to 6 (1985), and declaratory relief. The parties filed a series of cross-motions for summary judgment, three of which addressed whether Echo had commenced operations under the terms of the JOA. On January 14, 2015, the district court held a consolidated hearing on all of the motions for summary judgment. The court granted Echo's motion for summary judgment and issued a final judgment in Echo's favor on February 3, 2015. The court then awarded attorneys' fees against Enduro consistent with NMSA 1978, Section 70-10-6 (1991). Enduro appealed both the order granting summary judgment on the issue of commencement and the order awarding attorneys' fees.

7

**{18}** Summary judgment on whether Echo had actually commenced drilling operations would only be appropriate if "there are no genuine issues of material fact" and either Echo or Enduro is "entitled to judgment as a matter of law." *See Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶ 6, 310 P.3d 611 (quoting *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582) (internal quotation marks omitted). We review the grant of a summary judgment de novo, viewing "the facts in a light most favorable to the party opposing summary judgment and draw[ing] all reasonable inferences in support of a trial on the merits" because summary judgment is a "drastic remedy." *Id.* ¶ 6 (internal quotation marks and citation omitted).

**3.  An issue of material fact pertinent to whether Echo timely commenced drilling operations must be resolved by the factfinder**

**{19}** On December 1, 2010, Echo sent Enduro's predecessor in interest, Conoco Phillips, notice that Echo was proposing a plan to drill a new well (6H Well). On December 28, Conoco "elected to not participate in the drilling of the" 6H Well. On December 29, 2010, Enduro executed an agreement to purchase Conoco's interests in the property covered by the JOA. Echo's 120-day period to commence operations ended on April 2, 2011.

**{20}** Echo submitted evidence that it had engaged in the following activities prior to April 2, 2011, as proof that it actually commenced drilling operations. On November 30, 2010, it surveyed and marked the well site, the center line for the access road, and "other points." Prior to November 30, 2010, it contacted a petroleum engineer, Joe Janica, to assist with securing a drilling permit from the New Mexico Oil Conservation Division (OCD). Janica arranged for activities required to obtain the permit: surveying and marking the 6H Well site, designing a closed loop waste-removal system for the well, and preparing the drilling permit application. Echo also began consulting with John Thoma, a geologist with expertise in horizontal wells. And Echo contacted a fracking contractor who, in January 2011, "committed" to providing fracking services for the 6H Well sometime between May 15 and June 15, 2011. On or around March 24, 2011, Echo entered into a contract with JW Drilling to provide drilling services for the 6H Well and agreed to a $70,000 liquidated damages clause in favor of the contractor. The contract provided that JW Drilling would be available to drill the 6H Well on May 20, 2011, or as soon as it finished work on another well in Lea County, New Mexico. Finally, on March 31, 2011, Echo submitted its drilling permit application to OCD.

**{21}** No party disputes what occurred after April 2, 2011. Echo did not repropose the project to Enduro. Instead, Echo moved forward with the project. OCD approved Echo's application for a permit on April 13, 2011. The 6H Well site was prepared for drilling between May 6 and May 14, 2011. JW Drilling commenced drilling the well on May 25 and completed drilling by June 10, 2011. The well was prepared for fracking and fracked between June 16 and July 7, 2011. Finally, the well began pumping on or about August 5, 2011.

8

**{22}** The Court of Appeals acknowledged that Echo "designed a closed loop system, and obtained a drilling procedure, spud program, and casing program . . . communicated with . . . a geologist[] regarding the design and engineering of a lateral for Well 6H . . . , [and] entered into a drilling contract" all before the end of the 120-day period. *Enduro*, 2017-NMCA-018, ¶ 16. But the Court wrote that it would be a "mistake" to allow "'any' preparations to count as commencement" and thus held that Echo's actions could not be "characterized as 'commencement'. . . . as a matter of law." *Id.* ¶ 29.

**{23}** Echo argues that off-site activities relating to the planning and organizing of a drilling project should be considered when determining whether a party has commenced operations. Specifically, it contends that the recent changes in industry practices, brought on by the advent of lateral drilling and hydraulic fracturing, have made the planning and organizing of oil wells more complicated and that, as a result, the nonphysical activities involved in well drilling should be given more weight when determining if a party has commenced operations.

**{24}** Enduro, on the other hand, asserts that planning, meetings, and other "back-room" activities cannot substitute for meaningful on-site activity demonstrating commencement. During oral argument Enduro also argued that on-site physical acts are superior to off-site activities because "under the JOA, [Enduro] is completely dispossessed of any right to any record of the operation," and therefore Enduro "can't verify" the off-site activities in which Echo engaged. We are not persuaded by this argument. To the extent Enduro's argument is that on-site activities are superior because it could have traveled to the well site and observed the activities, we note that the only provision in the JOA stating anything about denying the nonconsenting parties access to business records would also deny the nonconsenting party any "right *to observe such operation* . . . until such time as the Nonconsenting party's share of the cost of such operation and the non-consent penalty applicable thereto has been recovered by the Consenting parties as provided for herein." (emphasis added).

**{25}** No provision appears in the plain language of the JOA indicating that only on-site physical activities should be considered when determining whether a party has commenced operations. If anything, the JOA can be read as indicating the importance of off-site activities in demonstrating commencement. For instance, the JOA includes a provision allowing an operator to unilaterally extend the commencement period if the extension is "necessary to obtain permits from government authorities, surface rights (including rights of way) or appropriate drilling equipment, or to complete title examination."[3] Obtaining permits, surface rights, and completing title examination are all off-site organizational and planning activities.

---

[3]The provision was not available to Echo in this case because it only applied in situations where all parties to the JOA had consented to the proposed operation.

9

**{26}** Echo produced verifiable documentary evidence that it surveyed and staked the well site, entered into a contract for drilling services, prepared and submitted a drilling permit, and consulted with its geologist regarding the design of the 6H Well. It provided testimonial evidence that it obtained a commitment for fracking services.[4] Of these acts, the most probative evidence that Echo committed resources demonstrating its intent to diligently carry on drilling activities until completion was its entry into a drilling contract. Without the drilling contract, the factfinder would have to weigh Echo's other off-site activities when deciding whether Echo actually commenced drilling operations. If it is undisputed that Echo entered into a binding drilling contract before April 2, 2011, we would conclude as a matter of law that Echo actually commenced drilling operations.

**{27}** However, Enduro contends that there is a genuine issue of material fact as to whether Echo timely accepted JW Drilling's bid proposal because the signature from Echo's agent is not dated. The bid proposal was required to be accepted within ten days of when JW Drilling signed the proposal. JW Drilling signed the proposal on March 14, 2011. Arguably because the acceptance date is unknown the proposal might have been accepted after the April 2, 2011, deadline for commencing drilling operations, and even if it was signed before the April 2, 2011, deadline, the contract may not have been enforceable. Echo admits that its contract signature was not dated, but asserts that because the terms of the proposal required acceptance within ten days of being received, Echo must have accepted the proposal on or before March 24, 2011. The drilling contractor indicated that he did not have "any doubt" that the drilling contract was effective in mid-March of 2011, but also admitted that it was "possible but unlikely" that Echo responded outside the ten-day deadline because the drilling company might have allowed parties to accept after the ten-day deadline in the past. Additionally, Echo's corporate representative could not confirm the date on which he signed the contract proposal on behalf of Echo. Yet, it remains undisputed that JW Drilling drilled the well in accordance with the proposal signed by both parties.

**{28}** Whether Echo and JW Drilling entered into a binding contract before the April 2, 2011, deadline is a genuine issue of material fact that remains in this case. Summary judgment should not be granted if there is a genuine issue of material fact in dispute. *Cebolleta Land Grant, ex rel. Bd. of Trustees of Cebolleta Land Grant v. Romero*, 1982-NMSC-043, ¶ 3, 98 N.M. 1, 644 P.2d 515. Accordingly, the district court and Court

---

[4]Enduro objected to the admissibility of the testimonial evidence because it came from affidavits in which the affiants recalled out of court conversations in which the contractor "commit[ted]" to providing services between May 15 and June 15, 2011. The statement should have been admissible for the nonhearsay purpose of showing how the delay in availability of a fracking crew influenced Echo's coordination and planning for the 6H Well. *See State v. Reyes*, 2002-NMSC-024, ¶ 29, 132 N.M. 576, 52 P.3d 948 ("[I]f an out-of-court statement is offered in evidence merely for the purpose of establishing what was said at the time, and not for the truth of the matter, the testimony is not hearsay."), *abrogated on other grounds by Allen v. LeMaster*, 2012-NMSC-001, ¶ 29, 267 P.3d 806.

of Appeals erred in granting summary judgment.

**B.      The Court of Appeals Award of Attorneys' Fees was Premature**

**{29}**    The Court of Appeals should not have issued an order granting attorneys' fees and costs to Enduro while a writ of certiorari on the merits of its decision was pending in this Court.  Echo correctly points to NMSA 1978, Section 34-5-14(B) (1972), which states that "upon filing of the application [for a writ of certiorari], the judgment and mandate of the court of appeals shall be stayed pending final action of the supreme court."  The statute's language indicates that the mere filing of a writ of certiorari automatically stays both the "judgment and mandate" of the Court of Appeals. Rule 12-403 NMRA states that costs and fees are only awarded to the "prevailing party." Whether Enduro was a prevailing party on appeal would depend on the "judgment and mandate" of the Court of Appeals.  But the Court's "judgment and mandate" were suspended on December 16, 2016, when Echo petitioned this Court for a writ of certiorari.  Therefore, there was no underlying basis on which the Court of Appeals could award costs and fees on January 10, 2017, when Echo's writ of certiorari was still pending in this Court.

**II.      CONCLUSION**

**{30}**    We reverse the Court of Appeals' award of summary judgment in favor of Enduro and its award of appellate costs and attorneys' fees to Enduro.  We also reverse the district court's grant of summary judgment to Echo and remand for proceedings consistent with this opinion.

**{31}    IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**CHARLES W. DANIELS, Justice**

_____
**BARBARA J. VIGIL, Justice**

11